UNITED STATES of America

v.

Ronald HUGHES, Sr.

Nos. 3–94–CR–075–X, 3–98–488–X.

United States District Court,
N.D. Texas,
Dallas Division.

June 30, 1999.

Susan Beth Cowger, Rose Linda Romero, United States Attorney's Office, Northern District of Texas, Dallas, TX, for Plaintiff.

Herbert Campbell Zachry, Jenkens & Gilchrist, Gary Alan Udashen, Ronald D. Wells, Milner, Lobel, Goranson, Sorrels, Udashen & Wells, David Randall Johnson, Southwestern Bell Telephone Company, Dallas, TX, for Defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S FINDINGS, CONCLUSIONS AND RECOMMENDATION

KENDALL, District Judge.

After recalling the three week jury trial this Court conducted, after making an independent review of the pleadings, files and records in this case, the transcript of the evidentiary hearing before the magistrate judge, and the Findings, Conclusions and Recommendation of the United States Magistrate Judge, as well as the evidentiary hearing conducted by the District Court on movant's 28 U.S.C.§ 2255 motion on June 28 thru June 30th, 1999 inclusive, I am of the opinion that the Findings and Conclusions of the Magistrate Judge are correct and they are adopted as the Findings and Conclusions of the Court.

**SO ORDERED.**

### FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

BOYLE, United States Magistrate Judge.

Pursuant to Title 28, United States Code, Section 636(b), and an Order of the Court in implementation thereof, this cause has previously been referred to United States Magistrate Judge Jane J. Boyle. The findings, conclusions and recommendation of the Magistrate Judge, as evidenced by her signature thereto, are as follows:

### FINDINGS AND CONCLUSIONS:

*Type Case:* This is a Motion to Vacate, Set Aside or Correct Sentence brought pursuant to Title 28. United States Code, Section 2255.

*Parties:* Defendant, Ronald W. Hughes, Sr., is a federal prisoner currently incarcerated in the Federal Correctional Institution located in Bastrop, Texas.

Respondent is the United States of America.

### I.

### BACKGROUND

Defendant, Ronald W. Hughes, Sr. ("Hughes"), moves the Court in this 2255 action to vacate his 1995 conviction for various offenses arising out of a money

laundering scheme.[1] He charges that the government failed to disclose two pieces of exculpatory evidence, one of which would have impeached the key government witness in the case[2] and supported his defensive theory. The other undisclosed item, Hughes claims, would have established a personal bias against him by the government's lead case agent.[3] The government opposes the motion and vigorously disputes the materiality of this evidence. **Evid. Hrg. Tr. at 128–31.** As will be discussed in detail below, based upon the nature of the withheld evidence and its bearing upon the key issue at trial, this Court finds, under the standards established by the Supreme Court in *Brady*[4], *Bagley*[5] and *Kyles*,[6] that Hughes' due process rights were violated by the non-disclosure, and accordingly recommends Hughes' conviction be vacated.

In beginning this *Brady* analysis, the Court turns first to a summary of the evidence adduced at trial.

### 1.  *Factual Summary*[7]

As summarized by the Fifth Circuit in its opinion on Hughes' direct appeal, the evidence presented at trial established the following facts:

> Ronald Hughes, Sr., ran his family's funeral home business near Dallas. In June, 1989, Hughes was visiting with Harry Pierce, an old acquaintance who was at the time doing odd jobs for Hughes, at the site of a church in Cedar Hill, Texas, that Hughes had purchased recently and intended to convert into a funeral home. At this meeting, Pierce asked whether Hughes knew "where a person could invest some money on a long-term basis and where they could earn some interest." Pierce stated that he knew Betty Allen who had about $1 million that she was looking to invest. Hughes responded that he was in fact looking for approximately that amount to complete the financing on his new funeral home conversion project.
>
> Shortly thereafter, Pierce arranged a meeting with Hughes and Allen, at which meeting Allen agreed to loan Hughes $1 million. [According to Hughes] Allen related to Hughes that the money had come from a now-deceased, former lover (Joe Brown) who had been distrustful of banks and who liked to keep large sums of cash around. Hughes and Allen closed the loan transaction on July 1, 1989, and a local attorney prepared the necessary documentation. Allen instructed the attorney to make the note payable to Allen and Robert Chambers, explaining that Chambers was a friend of hers and Joe Brown's who had an interest in the money that Brown had left her.[8] At the behest of

---

1.  On March 9, 1994, Hughes was charged in a multi-count indictment with conspiracy to commit money laundering (in violation of 18 U.S.C. § 1956(a)(1)) in violation of 18 U.S.C. § 371 (count 1); money laundering in violation of 18 U.S.C. § 1956(a)(1) (Counts 2, 4 and 5); money laundering in violation of 18 U.S.C. § 1957 (Counts 7 and 16) and structuring a financial transaction to evade the reporting requirements of 31 U.S.C. § 5313(a) in violation of 31 U.S.C. § § 5322(b) and 5324(3) (Counts 8—12).

2.  Supplement to Motion Pursuant to 28 U.S.C. § 2255 ("Supp. To Mot.").

3.  *See* Memorandum in Support of Motion Pursuant to 28 U.S.C. § 2255 ("Section 2255 Mem.").

4.  373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5.  473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

6.  514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

7.  Footnotes 8–10, infra .were contained in the Fifth Circuit's opinion.

8.  Chambers, prior to his arrest in 1991, smuggled marijuana and cocaine into the United States from Mexico and Columbia. He was reportedly the last "soldier" left in the Pablo Acosta drug organization. According to the government. Chambers gave some of the currency that he earned in this drug trade

Hughes' attorney, Allen also provided Hughes with a written statement representing that none of the loan proceeds was derived from illegal activity. Hughes and Allen agreed that the money—all delivered in cash—would be deposited in increments of less than $10,000 each. Hughes proceeded to do this, making nearly 200 separate deposits of cash in eleven different financial institutions during the course of his dealings with Allen.

On July 20, 1989, Pierce telephoned Hughes and explained that Allen had asked Pierce to meet her in Scottsdale and then fly back with her to Dallas. Because he was unable to do so. Pierce requested that Hughes go in his place. Hughes agreed and flew the following day to Scottsdale aboard a chartered plane that had been arranged by Pierce. Upon his arrival, Hughes met Allen, who said she needed him to accompany her on an errand, at which time the two drove to a storage facility in Phoenix and removed approximately $2 million in cash from a safe located in the facility.[9] Hughes and Allen returned with the money to the Scottsdale airport and flew to Dallas, whereupon Hughes delivered the money, per Allen's instructions, to Pierce's apartment.

Hughes subsequently received a second call from Allen in which she indicated that she had an additional $1.9 million to invest with Hughes.[10] The money that formed the basis of this second loan had been brought from Alpine, Texas, by Pierce, Allen, and Jerri Allen ("Jerri"), Allen's daughter. The three passengers had flown to Alpine aboard Allen's airplane, where a pickup truck pulled up to the plane and loaded the money aboard in trunks and bags. Hughes met the group at the Dallas airport upon their return and took the money—again all of it in cash. The note evincing this loan transaction was executed on November 1, 1989.

Although it is undisputed that Chambers came to Dallas on August 8, 1989, to meet with Hughes, the parties dispute virtually every facet of the meeting. The government claims that at this meeting Chambers told Hughes that the money belonged to him and that he had an extensive relationship with Acosta and was "the last soldier left in the [Acosta] organization." According to the government, Hughes then told Chambers that he had had a former FBI agent friend of his run a check on Chambers and that this friend would help them stay apprised of whether the IRS was conducting any money laundering investigations in the area.

Hughes contests this account, saying that Chambers told him that he was a former Green Beret who had done a few favors for Mexican law enforcement personnel. Although Hughes does not dispute that he told Chambers that he had run an FBI check on him, Hughes claims that he never did so and was only making comments to that effect to "level the playing field." Hughes also points out that the former FBI agent testified at trial that he had not run such a check until April 1990. Hughes does concede, however, that Chambers indicated that the money was his, that he had once worked for a man named Pablo Acosta, that he had inherited Acosta's turf, and

to Allen so that she could help him hide the money. After his arrest and conviction, Chambers entered into a plea bargain and agreed to testify against Allen and company in this action in exchange for leniency in sentencing.

maintains, however, that the money came from Joe Brown. The government contends that the money belonged to Chambers and had been placed with a girlfriend of Chambers' in Phoenix prior to its being moved to the storage facility.

9. The parties contest ownership of the money. According to Hughes, Allen indicated that the money had been placed in the safe. Allen

10. None of the parties contests the amount of the loan, although the second note reflects only that $1 million was loaned to Hughes.

that Acosta was "like a godfather" to him.

Hughes had no further contact with Chambers until [June] 1990, when the two met with Allen and Jerri. Ostensibly, the meeting was called to figure out where all the money (nearly $5 million in total) had gone and who was responsible. The meeting degenerated into a shouting match between all of the parties and was followed by Chambers' mad search through a mausoleum owned by Hughes in which Chambers believed that Allen and Hughes had hid the money. To everyone's knowledge except Hughes, the meeting was recorded on audio tape.

Chambers was arrested in 1991 and, after being convicted, agreed to testify in the instant case in exchange for leniency in sentencing. Hughes was charged with various counts of money laundering and structuring, Allen with various counts of money laundering, Hughes' son with various counts of structuring, and Jerri with two counts of structuring and one count of money laundering. Hughes, Allen, and Jerri also were charged with conspiracy to launder.

*United States v. Hughes, et al,* No. 95–10861, 102 F.3d 550 slip op. at 2–6 (5th Cir. October 30, 1996).

### 2. Procedural Background

After a three-week jury trial in April, 1995, Hughes was convicted by the jury on all but one of the money laundering charges and acquitted on all of the structuring charges. On September 18, 1995, Hughes was sentenced to 165 months in prison and assessed a $500, 000 fine. He filed a direct appeal with the United States Court of Appeals for the Fifth Circuit and the appeals affirmed his conviction in an unpublished opinion filed October 30, 1996. *United States v. Hughes, et al,* No. 95–10861, slip op. (5th Cir. October 30, 1996).

His § 2255 motion followed on February 23, 1998.[11]

Upon reviewing Hughes' § 2255 motion, this Court scheduled an evidentiary hearing to develop his *Brady* claim. The hearing was held on January 12, 1999. At the hearing Hughes offered evidence, by way of testimony and documentation, to support his claim that the government withheld material evidence at the time of trial. Specifically, Hughes presented the testimony of FBI Special Agent Stephen Largent, who had interviewed IRS Special Agent Charles Holmes, the chief investigator in Hughes' case, prior to trial. Agent Largent stated that he had interviewed Holmes in 1994 in connection with an internal investigation of FBI Special Agent James A. Montee's activities with the Hughes family and his possible inappropriate involvement in the investigation of the case. Largent stated that his FBI 302 Interview Form established that during the 1994 interview Holmes made the following statement:

> Holmes stated that Glenn Chambers was busted with one ton of cocaine and pled guilty to the charges agreeing to cooperate. Chambers has told Holmes that the Hughes family knew that the money they received was drug money about six weeks after receiving the money. He stated that Betty Allen knew from day one that the money was drug money, but that all evidence supports the fact that Betty Allen initially told Ronald Hughes, Sr. that the money came from her former lover Joe Brown. **Evid. Hrg. Tr. at 13–16, 121–22, Pl.'s Ex. 1.**

Hughes also offered the testimony of U.S. Customs Agent Dan Dobbs, who had testified for the government at Hughes' trial. Dobbs testified that during the Hughes' investigation he engaged in a telephone conversation with Holmes in which Holmes indicated that he had had a prior problem with a Hughes family member

---

**11.** Hughes raises several issues in his motion to vacate, however, because his *Brady* claim

warrants relief the remaining grounds will not be addressed.

and that he would do whatever was necessary to "get" Mr. Hughes. **Govt.'s Ex. 1, Evid. Hrg. Tr. at 19—20, 29, 40, 48—50.** The alleged conversation between Holmes and Dobbs, according to Dobbs, occurred on November 7, 1990. **Id. at 31, 27, 33.**[12]

Hughes claims his due process right to a fair trial was violated by the government's failure to disclose these two items of proof and, on this basis, seeks a new trial.[13]

## II.

## ANALYSIS

■ To prevail on a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Defendant must establish that his due process rights were violated by proving that: 1) the prosecution suppressed or withheld evidence; 2) the evidence was favorable to the defense; and 3) the evidence was material to either guilt or punishment. *United States v. Fisher,* 106 F.3d 622, 634 (5th Cir.1997) (quoting *Westley v. Johnson,* 83 F.3d 714, 725 (5th Cir.1996), *cert. denied,*519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997)). Favorable evidence has been deemed material when, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S.

667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). A " 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381); *Westley v. Johnson,* 83 F.3d at 725. This does not require a showing "that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . ." *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566 (citations omitted). "A reviewing court may consider any adverse effects the prosecutor's failure to release information might have had on the defendant's preparation and presentation of the case." *Derden v. McNeel,* 938 F.2d 605, 617 (5th Cir.1991)(quoting *United States v. McKellar,* 798 F.2d 151, 153 (1986)).

### 1. Brady Factors

■ Applying the foregoing factors to the issues at hand, the Court finds, as to the first *Brady* factor, that Hughes has met his burden of proving that the government suppressed both pieces of evidence. Based on the evidence adduced at the evidentiary hearing, it is clear that the two items of proof were known to government agents involved in the case at the time of trial and were not in the possession of or disclosed to Hughes. **Evid. Hrg. Tr. at 13–16, 24–30, 51–73.**[14]

---

**12.** The FBI 302 memorializing this statement was entered into evidence as government's exhibit No. 1. The date on the 302 is October 10, 1995. Consequently, Hughes did not move for its introduction due to the fact that it was created after the trial. However, both sides agree that the alleged conversation between Dobbs and Holmes, despite the fact that it was memorialized in a 1995 302, took place in November, 1990.

**13.** In briefing prior to the evidentiary hearing, Hughes relies on two additional statements ostensibly made by Dobbs regarding Hughes' lack of culpability. Supp. To Mot., Ex. A. Yet, at the hearing, during questioning and argument. Hughes confined his focus about the undisclosed Dobbs-evidence to his assertion that Holmes revealed to Dobbs a

personal bias against Hughes Evid. Hrg. Tr. at 8, 24–30, 39–41, 47–51, 133–35. Because Dobbs was not questioned about the other alleged statements, the Court will confine its analysis to the personal bias allegation.

**14.** It should be clear, however, that Hughes does not charge that the government attorneys knew of the evidence and willfully suppressed it or that the proof was even in their possession prior to trial. **Evid. Hrg. Tr. at 7,** Nevertheless, this is not the standard for proving a *Brady* violation. As to possession, as explained by the former Fifth Circuit in *United States v. Antone,* 603 F.2d 566 (5th Cir.1979), "this court has declined to draw a distinction between different agencies under the same government, focusing instead upon

As to the second *Brady* factor, above, whether the evidence was favorable to Hughes, the government neither concedes nor disputes this point. **Govt.'s Resp. at 3; Evid. Hrg. Tr. at 10–11, 125–31.** The government challenges the credibility of Dobbs' testimony that Holmes held a personal bias against Hughes. **Evid. Hrg. Tr. at 125–28.** Whether the government, by its challenge to Dobbs' credibility, is maintaining that the Dobbs evidence is not favorable to Hughes (factor 2) or is instead mounting a challenge to the materiality of this proof (factor 3) is not clear. Nonetheless, the Court finds the withheld Dobbs-proof favorable to Hughes. Similarly, as to the FBI–302 regarding Chambers as related to Largent, the government again fails to address this evidence in terms of whether or not it is favorable to Hughes. Rather, the government's argument on this piece of proof centers on the issue of its materiality. **Evid. Hrg. Tr. at 128–31.** The Court also finds the FBI–302 evidence favorable to Hughes. In sum, the Court finds both pieces of evidence favorable to Hughes, and that the resolution of Hughes' *Brady* claim turns on the materiality of this proof to Hughes' guilty verdict.

### 2. *Materiality of the Evidence*

*Issue at Trial*

In order to assess whether the non-disclosure "undermines confidence in the outcome of the trial," and is, thus, material, the Court must first ascertain the issues in dispute at Hughes' trial. By identifying the contested issues at trial, the Court can more accurately assess the potential impact of the missing evidence on the outcome of Hughes' trial.

In discerning the material issue or issues in dispute, the Court naturally turns first to the elements of the offenses with which Hughes was charged which, in turn, dictated the nature of the government's proof at trial. Money laundering under both sections 1956 and 1957, of which Hughes was convicted, requires, *inter alia,* a showing that *at the time of the unlawful financial or monetary transaction,* that the defendant knew that it involved the proceeds of some specified unlawful activity.[15] 18 U.S.C. § § 1956(a)(1) and 1957.

the 'prosecution team' which includes both investigative and prosecutorial personnel." *Antone,* 603 F.2d at 569. And the good or bad faith of the prosecution is immaterial to determining whether the prosecution suppressed evidence. *United States v. Spagnoulo,* 960 F.2d 990, 994–95 (11th Cir.1992)(citing *United States v. Agurs,* 427 U.S. 97, 110 n. 17, 96 S.Ct. 2392, 2400 n. 17, 49 L.Ed.2d 342 (1976)). The government does not dispute these principles and stated to the Court that the fact that the proof was not available to the prosecutors themselves prior to trial is not a "technicality" on which they seek to rely in defending the *Brady* allegations. **Evid. Hrg. Tr. at 131.**

15. The plain wording of §§ 1956(a)(1) and 1957 and the Court's instructions to the jury bear this out. Hughes was convicted of Counts 4 and 5 of the indictment which charged him with money laundering under 18 U.S.C. § 1956(a)(1). That statute, as set forth in the Court's charge, provides:

Whoever, knowing that the property involved in the financial transaction represents the proceeds of some form of unlaw-

ful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity...
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceed of specified, unlawful activity;...
[shall be guilty of an offense against the United States]. 18 U.S.C. § 1956(a)(1); R. Vol. 2 at 277 (court's charge).
The Court's charge further instructed:
Specifically, Counts 2, 4 and 5 alleged that on June 27, 1989, July 21, 1989, and August 1, 1989, respectively, the defendant... Ronald W. Hughes, Sr. and others, knowingly, willfully and to conceal and disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, conducted and attempted to conduct financial transactions affecting interstate commerce, both knowing that the property involved in the financial transactions were proceeds of some form of unlawful activity, and which in fact were the

Similarly, conspiracy to commit § 1956(a)(1) money laundering under 18 U.S.C. § 371 requires a showing that the defendant knew of the unlawful purpose of the conspiracy, in this case § 1956(a)(1) money laundering.[16]

Having reviewed the twelve-volume transcript of the trial, the indictment, the District Court's instructions to the jury and the evidence and arguments at the evidentiary hearing, it is abundantly clear that the key issue at trial with respect to the conspiracy and §§ 1956 and 1957 counts was whether Hughes knew at the time of the three money transfers on June 27th, July 21st and August 1st, 1989, that

the money was derived from drug trafficking. Hughes did not contest that he had received the cash transfers from Allen. In fact, there is little dispute that Hughes' knowledge of the source of the money was essential to the government's case and the primary focus of both sides' evidence. The record is replete with references to this issue. **T. XII at 21, 23, 24, 25, 45—58, 55, 59, 95, 97, 98, 101, 107; Evid. Hrg. Tr. at 6–9, 121–31.** With this in mind, the Court turns to the government's proof and Hughes' defense.

### Government's Theory and Proof

In establishing that Hughes knew that the monies he had received from Betty

---

proceeds from the sale and distribution of narcotic drugs, that is, in Count 2. Betty L. Allen transferred approximately $1 million in United States currency to Ronald W. Hughes, Sr.; in Count 4, Betty L. Allen transferred approximately $2 million in United States currency to Ronald W. Hughes, Sr.; and in Count 5, Betty L. Allen transferred approximately $1,900,000 in United States currency to Ronald W. Hughes, Sr.

In order to establish a violation of this statute, the government must prove beyond a reasonable doubt:

*First:* That the Defendant under consideration knowingly conducted or attempted to conduct a financial transaction;

*Second:* That the Defendant under consideration *knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activities;*

*Third:* That the property involved in the financial transaction did in fact represent the proceeds of some specified unlawful activity, to wit importation, sale or distribution of cocaine; and

*Fourth:* That the Defendant under consideration engage in the financial transaction with the intent to conceal or to disguise the nature, the location, the source, the ownership, or the control of the proceeds as specified unlawful activity. Id. at 278 (emphasis added).

Hughes was also charged and convicted in Counts 7 and 16 of the indictment of money laundering under

18 U.S.C. § 1957. The Court instructed:

Whoever, [within the United States] knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a greater value than $10,000.00 and is derived from specified

activity [shall be guilty of an offense against the United States]. R. Vol. 2 at 280.

The Court's charge continued:

Counts 7 and 16 allege that on or about September 6, 1989, and November 15, 1989, respectively, Defendant Ronald W. Hughes, Sr. purchased real property known as 332 Cedar Street, Cedar Hill, Texas, for approximately $300,000, and a certificate of deposit for approximately $400,000, respectively. The court's charge instructed that in order to establish a violation of the statute, the government must prove beyond a reasonable doubt that:

*First:* That the Defendant under consideration knowingly engaged or attempted to engage in a monetary transaction;

*Second:* That the Defendant under consideration *knew that the monetary transaction involved criminally derived property;*

*Third:* That the monetary transaction was of a greater value than $10,000.00;

*Fourth:* That the criminally derived property was in fact derived from the specified unlawful activity of importation, sale or distribution of cocaine; and

*Fifth:* That the monetary transaction took place within the United States. Id. at 281. (emphasis added).

**16.** The Fifth Circuit recognized this essential element of the government's proof with respect to § 1956(a)(1) in its opinion affirming Hughes conviction when it explained:

"[t]he government properly noted in the indictment, and the court so instructed the jury, that Hughes could be found guilty of [1956(a)(1) money laundering] only if he knew of the illegality of the proceeds *at the time of his receipt of the money.*" *United States v. Hughes, et al,* 102 F.3d 550 slip op. at 15 (5th Cir.1996)(emphasis in original).

Allen constituted drug proceeds, the government relied heavily upon the testimony of admitted drug-trafficker Robert Chambers. **T. II at 37—46, 87—169; T. III, 3—201; T. XII at 88—108.** Chambers testified that the Joe Brown story was concocted, not by Betty Allen, but by him in August 1989 *after* Hughes had received the three cash transfers. **T. II at 109–10, 114–15; T. III at 90–97, 195–96.** He testified that there was "no doubt" in his mind that Hughes knew the money was illegal. **T. II at 167.** This testimony formed a key part of the prosecution's theory of the case which continued through closing arguments where the government attorneys argued that Hughes knew the money was illegal before the transfers and that the Joe Brown story was "phony" and "ridiculous" and fabricated by Chambers *after* the transfers of cash. **T. XII at 21, 25–27, 89, 95, 104.** The prosecution continually referred to the testimony of Chambers in their closing statements in support of their version of events. **T. XII at 18–20, 27, 28, 89–90, 93–95.**

*Hughes' Defense*

Hughes mounted a vigorous defense essentially focused on his contention that he did not know the $4.9 million he had received from Betty Allen was drug money. **T. II at 67–68; T. IX at 71—87, 106–120, 157—164; T. X at 47—109, 185–187; T. XII at 46—61; Evid. Hrg. Tr. at 7—10, 121—123, 51–72, 81–89.** Hughes did not dispute at trial that he had received the three cash transfers from Allen, which

formed the basis of the § 1956 counts (counts 2, 4 and 5), and from which the funds were derived for the financial transactions upon which the § 1957 counts (counts 7 and 16) were based. Rather, the thrust of his defense to these charges was that he did not know the money involved in the transactions was derived from drug trafficking. **T. II at 64–68; T. X at 47–109; T. XII at 44–61.** More precisely, Hughes' defensive theory was that in early June, 1989, Betty Allen had told him, prior to receiving the cash, that the money was given to her by her wealthy former lover Joe Brown. **T. X at 57–60.** This theme ran throughout Hughes' case from opening statement to closing argument. **T. II at 64–68; T. III at 81–119; T. XII at 44–61.**

*Materiality of the Undisclosed Evidence*

█ Having reviewed the key issue at trial and the prosecution and defense's theories and proof, the Court now turns to its task of deciding whether the two undisclosed pieces of proof were material to the outcome of Hughes' trial. As explained below, the Court finds that the evidence was material under *Brady* standards and that government's failure to disclose it to Hughes deprived him of his due process right to a fair trial.

The FBI–302 showed that prior to trial Chambers had made a statement to the lead case agent about Hughes' knowledge of the source of the money which was inconsistent with his trial testimony and which exculpated Hughes.[17] As detailed

---

**17.** At the evidentiary hearing the government attempted to dismiss the materiality of the 302 by arguing that it was not inconsistent with Chambers' trial testimony because Chambers testified at trial that he had not even met Hughes until six weeks after the transfers and that it was at that meeting that he first told Hughes of his association with drug lord Pablo Acosta. **Evid. Hrg. Tr, at 128–31.** In other words, the government argued that Chambers never tried to state or imply during the trial that he told Hughes that the money was drug money until August 8th of 1989, after the transfers, which, the government argues, is entirely consistent with the 302. But this argument collides with the

government's case theory and one of its objectives for calling Chambers in the first place. Chambers' testimony was used to refute Hughes' Joe Brown defense by establishing that Chambers first came up with the Brown story *after* the transfers, rendering Hughes' Joe Brown story and Hughes himself a liar. Chambers never testified, as reflected in the 302, that Hughes had been told the Brown story before the transfers. Thus, the 302 is directly contradictory to Chambers' testimony that he had fabricated the Joe Brown story *after* the transfers and, by implication, that Hughes knew the money was drug-related when he received it.

previously, according to FBI Special Agent Largent. Holmes related to him that Chambers had told him that Hughes did not know the true source of the funds until six-weeks after receiving it and that Hughes was told that the money was given to Betty Allen by Joe Brown. The 302 also reflected Holmes' apparent observation that "all evidence" supported the fact that Hughes had initially been told the Joe Brown story by Allen. This evidence is material and its non-disclosure violates *Brady* for several reasons.

First, the issue at trial centered on Hughes' knowledge of the source of the funds, a focal point of Chambers' testimony. Hughes had no information prior to trial that Chambers had ever given an inconsistent statement on this crucial point. And the FBI–302 was not only inconsistent with Chambers' trial testimony, it also exculpated Hughes, by suggesting that he did not know the illicit source of the funds until after the transfers. The transfers, occurring between June 27 and August 1, 1989, were completed within a six-week time frame. Thus, the 302 statement attributed to Chambers that Hughes did not know the source until six weeks after receiving the money exculpates Hughes as to all three transfers. **Evid. Hrg. Tr. at 57–63**

Secondly, the FBI–302 was not only inconsistent with Chambers' trial testimony and exculpatory, it also completely supported Hughes' version of events that Betty Allen had told him the Joe Brown story before he received the money. Because

this evidence was not disclosed to Hughes' attorneys, Chambers, a key government witness, was not impeached or even questioned as he might have been had the evidence been disclosed.

Thirdly, in finding the 302 material under *Brady*, the Court also considers the manner in which this evidence could have been presented at trial and its potential impact on the jury, understanding, however, "the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled...." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. FBI Special Agent Largent was an extremely credible witness at the evidentiary hearing. Had the government disclosed his 302 to Hughes' defense team, they would not only have been able to use it to impeach Chambers,[18] it is plausible that they may have attempted to call Largent himself to the stand to impeach Chambers. The testimony of Largent, a credible law enforcement agent, who had no involvement in the Hughes investigation, would doubtless have had a significant impact on the jury's view of Chambers' credibility. Hughes' attorneys could have also used the 302 to question Holmes, the lead case agent about the lack of credibility of a key witness[19] in his investigation and his own statement to Largent that "all evidence" supported Hughes' version of events. Instead, neither Chambers or Holmes were questioned in these areas. T. II at 87–169; T. III at 3–201; T. XI at 5–8.

The government also attempted to minimize the effect of Holmes' statement in the 302 where he reported "all evidence supports the fact that Betty Allen initially told Ronald Hughes, Sr. that the money came from her former lover Joe Brown." The government argued that this statement was based on Holmes' interviews at that point in his investigation with Hughes, Pierce and Allen who had supported Hughes' version of the Joe Brown story. But the flaw in this argument is that there is nothing in the trial or evidentiary hearing record substantiating that Holmes ever talked to any of these individuals during his investigation. It is clear, however,

that Holmes had talked to Chambers and that his "all evidence" proclamation appears to subsume his discussions with Chambers and conflicts with Chambers' trial testimony.

18. At the evidentiary hearing, Hughes' trial counsel testified that he would have used the 302 at trial as part of his strategy to impeach Chambers and to establish Hughes' innocence. **Evid. Hrg. Tr at 63–65.**

19. Whom he had spent approximately 25 hours debriefing. **T. III at 135–36.**

In finding the 302 evidence material, the Court is mindful of the government's position that even had this proof been forthcoming, Hughes would have been convicted based on the other evidence against him. Evid. Hrg. Tr. at 11. The government specifically refers to a tape recording of a meeting between Hughes, Chambers and Allen in June 1990, in which, the government urges, both parties' understanding of the nature of the money was "clear." Id. Yet, the Court has listened to the tape and read the transcript and disagrees that it clearly inculpates Hughes as the government urges. The tape and transcript, admitted in evidence at trial as government's exhibits 57 and 57(a), respectively, recorded a June, 1990 meeting between Hughes, Chambers, Allen and Allen's daughter. The conversation is inaudible in several places and the precise conversation is difficult to discern. Moreover, nowhere on the tape is there an explicit reference to Hughes' knowledge of the source of the money at the time of the transfers. See Govt.'s Trial Ex. 57(a).

Despite the tape's infirmities, the Court does recognize that Chambers' testimony was not the sole basis upon which the government relied to establish Hughes' culpability. The government's theory also rested on its assertion that certain evidence established, circumstantially, that Hughes knew the money was tainted. Specifically, the prosecution argued that Hughes' extensive structuring activity, which began immediately after the first cash transfer, evidenced his nefarious intent. **T. XII at 21–24, 96–98.** The government also presented evidence and argued that the manner in which the money was received by Hughes, in $100's, $20's, $10's and $5's, banded together and contained in "boxes, bags and suitcases," and in a storage unit indicated that Hughes had to have known the funds were illicit proceeds. **T. XII at 25, 90, 95–98.** And the government attacked inconsistencies

between Hughes' and Allen's versions of the Joe Brown story and to the "preposterous" nature of both renditions. **T. XII at 25–26, 89, 104.** Finally, the government relied upon the fact that Chambers' name was on the note when Hughes signed it in July, 1989. **T. XII at 19.**

With the foregoing additional evidence used to convict Hughes, the government may be heard to argue that Hughes would have been convicted even if the *Brady* evidence had been disclosed. But, as explained by the Supreme Court in *Kyles*, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [*Brady*] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566. And Hughes did not. In determining the fairness of Hughes' trial, the Court may "consider directly any adverse effect that the prosecutor's failure to respond [to a Brady request] might have had on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. As discussed above, the Chambers testimony formed a cornerstone of the government's case. Consequently, despite the other evidence used to convict him, Hughes was deprived of the opportunity to challenge a major piece of the prosecution puzzle with quality evidence that cut to the heart of this proof.[20]

Having found the 302 material under *Brady* standards does not end Court's the inquiry, however, because the Court will also consider the collective effect of the non-disclosure of the 302 *and* the Dobbs evidence on the trial's outcome. *Kyles*, 514 U.S. at 436, 115 S.Ct. at 1567.

Dobbs' testimony at the evidentiary hearing was that Holmes had essentially told him in November, 1990 that he was going to carry out a personal vendetta

---

**20.** Without the *Brady* evidence the government still only partially prevailed on its charges against Hughes. He was acquitted of all the structuring charges and of the June 27th 1989 cash transfer count.

against Hughes through his investigation because of a prior problem with a Hughes family member. **Evid. Hrg. Tr. at 24–51.** Dobbs waffled a bit during his testimony at the evidentiary hearing on exactly how this statement by Holmes was related to him but did maintain during questioning by Hughes' attorney that Holmes had made such a statement to him. **Id.** Dobbs also testified that he never told anyone about Holmes' 1990 statement until 1995 when he was interviewed by Largent. **Id. at 46.** From Holmes' testimony at the evidentiary hearing, which went unchallenged, it truly did not appear that Holmes was acquainted with any Hughes family members prior to initiating his investigation. **Id. at 90–91.** However, based on this Court's observation of Holmes' testimony and demeanor at the hearing, he was the least credible witness to testify. Moreover, the record substantiates that Holmes engaged in some questionable pretrial antics,[21] which, combined with the vendetta evidence could have been used to further undermine the credibility of his investigation.[22] Thus, in the end, while it did not appear that Holmes knew or had problems with the Hughes clan prior to his investigation, it was not at all clear that he had not made the threat Dobbs accused him of making. With all of this in mind, although Dobbs' testimony did not carry the impact of Largent's 302 on Chambers, the Court, nonetheless, finds it material.

Its materiality stems from the potential cumulative effect of the vendetta evidence combined with the Chambers' 302 on the trial's outcome. The 302 contradicts the key government witness's testimony on the main issue at trial, supports Hughes' testimony and suggests that the lead case agent hid information contradictory to the government's factual theory of the case.[23] The Dobbs evidence, like the 302, calls into question the integrity of the investigation of the lead government investigator. While the collective effect of this missing proof cannot be ascertained with absolute precision, given its relation to the key issue at trial and the lead case agent, it deprived Hughes of a fair trial with a reliable outcome.

In conclusion, Hughes has established that his due process right to a fair trial was violated by the government's failure to disclose the FBI–302 and the Holmes vendetta evidence, both of which were favorable to the defense and material to the outcome of Hughes' trial. Consequently, Hughes should be granted the right to a new trial on all the charges for which he was convicted.

### III.

### *RECOMMENDATION*

In conclusion, it is respectfully recommended that Hughes' § 2255 motion be **GRANTED** on his *Brady* claim and his conviction **VACATED.**

---

21. Holmes was found to have "wired" an *informant in an attempt to obtain information* from Hughes after the indictment had been returned and after Hughes had retained counsel, prompting a motion and hearing by Hughes' attorneys asserting outrageous government conduct. **Tr. of Hrg., Feb.27, 1995 at 106–10; Evid. Hrg. Tr. at 67–69, 101–02.**(The District Court specifically commented after the hearing on this issue that "Special Agent Holmes... may not necessarily be a scholar on the Bill of Rights." **T. I at 8**). In another at questionable incident, Holmes appeared at the office of Hughes' CPA, who was later a witness at Hughes' trial. After threatening to get the CPA's license for allegedly disclosing grand jury information to Hughes,

the CPA scuffled with Holmes, prompting Holmes to arrest him and charge him with assaulting a federal officer. **Id. at 69–70, 100–01.** In arresting the CPA, Holmes took the CPA's belt off and wrapped it around his arms and took him into custody. **T. VII at 52–55.**

22. Hughes' trial counsel testified that he would have used this evidence at trial to undermine the credibility of the government's case. **Evid. Hrg. Tr. at 70.**

23. The testimony and evidence at the evidentiary hearing established that Holmes was present in the court room during the trial. **Evid. Hrg. Tr. at 71–72; Pl.'s Ex. 2.**

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions and recommendation on all parties by mailing a copy to each of them. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who dares to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. Failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir.1996)(*en banc*).