**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Gerald SPAGNOULO, Defendant–
Appellant.**

**No. 89–6131.**

United States Court of Appeals,
Eleventh Circuit.

May 20, 1992.

---

Theodore J. Sakowitz, Federal Public Defender, Miami, Fla., Patrick M. Hunt, Asst. Federal Public Defender, Ft. Lauderdale, Fla., Alison Marie Igoe, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Linda Collins Hertz, Dawn Bowen, Carol E. Herman, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before HATCHETT, Circuit Judge, JOHNSON * and HENDERSON, Senior Circuit Judges.

HATCHETT, Circuit Judge:

We reverse the convictions in this case because the government, without moral culpability or willfulness, suppressed evidence favorable to the appellant.

## I. FACTS

On February 6, 1987, David Brock arrived in Miami, Florida, on a flight from Boston, Massachusetts, to pick up a kilogram of cocaine for Gerald Spagnoulo, the appellant. Ruben Del Vejar, who had previously supplied Brock with cocaine for Spagnoulo, met Brock at the Miami International Airport and drove him to Del Vejar's house. While at Del Vejar's house, Brock removed $22,000 in cash from a gym bag and exchanged it for a kilogram of cocaine which he then placed into the gym bag for the return trip to Boston. Following the exchange, Del Vejar drove Brock to the Fort Lauderdale Airport for Brock's return flight to Boston.

Detective Norberto Vichot of the Broward County, Florida Sheriff's Office approached Brock inside the airport terminal after observing that Brock appeared nervous as he entered the airport and paid cash for a ticket while nervously kicking the gym bag. Vichot identified himself as a police officer, asked for some form of identification, and inquired as to Brock's destination. After producing a return plane ticket to Boston in the name of "David Jones," and a Massachusetts driver's license in the name of "David Brock," Brock explained that he traveled under the alias "David Jones" because of a past bad check problem with Eastern Airlines. Brock agreed to a pat-down search of his outer garments, but refused to consent to a search of the gym bag. Vichot advised Brock that the gym bag would have to be retained in order to allow a narcotics dog to sniff it, but that Brock was free to leave. Before the narcotics dog arrived, Brock told Vichot that he had to use the telephone and declined to accompany the detective to an office. Brock then left the airport and contacted Del Vejar who picked him up and took him to a hotel near the airport. After a narcotics dog had alerted to the bag and Vichot had obtained a search warrant, Vichot discovered one kilogram of cocaine in the gym bag. From the hotel, Brock telephoned Spagnoulo and told him about the incident with the detectives and the loss of the cocaine. Spagnoulo did not believe Brock's story and suspected that Del Vejar and Brock had devised a scheme to "rip off" the cocaine and the money. For this "rip off," Spagnoulo threatened to kill Brock.

Spagnoulo contacted his friends, Alex Mercolini and Steven McCarthy, and informed them of his intention to kill Brock. First, Spagnoulo paid a "Puerto Rican kid" $250 to use a machine gun to "shoot up the house" where Brock's family lived. Several days later, four bullets fired from an automatic weapon damaged the Brock family car. In preparation for his confrontation with Del Vejar and Brock in Miami, Spagnoulo acquired a shotgun, "sawed off" its barrel, purchased a $1,500 Lincoln Continental, and bought a handgun. As the final preparation for his trip, Spagnoulo asked McCarthy to use Spagnoulo's apartment and telephone in Spagnoulo's absence to provide an alibi to prove that he, Spagnoulo, had remained in Boston during the time he would actually be in Miami.

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

After Spagnoulo departed for Miami, McCarthy contacted the city of Miami police and informed them of Spagnoulo's plan to "shoot somebody" in Florida. During his drive down to Miami, Spagnoulo telephoned his father and learned that $20,000 had been stolen from the father's house. This news prompted Spagnoulo to telephone McCarthy and inform him that he, Spagnoulo, would be returning to Boston. While at a North Carolina airport awaiting departure of his flight to Boston, Spagnoulo assumed the alias Cirelli and informed Mercolini to pick him up the following day at the West Palm Beach Airport.

When Mercolini met Spagnoulo at the West Palm Beach Airport, Spagnoulo was driving a rental Cadillac because the long trip had "burned up the engine" on the Lincoln. During this series of events, McCarthy kept the police informed of Spagnoulo and Mercolini's whereabouts and plans.

Police officers in Miami arrested Brock and informed him of Spagnoulo's threats. Spagnoulo and Mercolini traveled to Del Vejar's house in Miami with the shotgun, but when they arrived at Del Vejar's house, neither Brock nor Del Vejar was at the house. Spagnoulo and Mercolini later returned to Del Vejar's house and noticed that several cars were in the area. Brock, who was in a police car parked in the area, identified Spagnoulo and Mercolini. Spagnoulo believed that the undercover cars surrounding Del Vejar's house were Del Vejar's associates and possible members of the Colombian mafia. Spagnoulo also suspected that the cars might belong to undercover police officers, and thus began to drive away. The police officers followed Spagnoulo, blocked the path of his car at a toll booth, and announced their presence. Spagnoulo and Mercolini jumped out of the car and ran. The officers were able to apprehend Mercolini, but Spagnoulo, carrying his handgun in his hand, escaped. In the trunk of the car the officers found a loaded shotgun and additional shells. Spagnoulo telephoned McCarthy and told him about the incident and his narrow escape. Spagnoulo then went to Orlando, Florida, boarded a flight to Boston. Upon arriving in Boston, Spagnoulo went to McCarthy's auto body shop.

On February 11, 1987, Detective Paul Barnacle of the Boston Police Department arrested Spagnoulo at his apartment. In a search, pursuant to a search warrant, Barnacle found an airline ticket stub for a flight from Fayetteville, North Carolina, to Boston in the name of Gerry Cirelli. Barnacle also found a beeper, a contract for lease of the beeper, and various papers and documents written in code reflecting Spagnoulo's drug business. A search of McCarthy's house revealed "a barrel which had been sawed off a shotgun," "some wood chips which came from the sawed-off stock," and "sawdust filings and iron filings that were found on the work bench in the cellar of McCarthy's house next to a vice grip." Laboratory analysis revealed Spagnoulo's thumb print and palm print on the barrel of the sawed-off shotgun.

## II. PROCEDURAL HISTORY

A federal grand jury in the Southern District of Florida returned an indictment charging Spagnoulo with: (1) conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a) and 846; (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2; (3) traveling in interstate commerce to commit a crime of violence to further an unlawful activity, in violation of 18 U.S.C. § 1952(a)(2); (4) using and carrying firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and (5) transporting an unregistered firearm in interstate commerce, in violation of 26 U.S.C. § 5861(j). On December 2, 1987, a jury convicted Spagnoulo on all counts of the indictment.

After the district court conducted several hearings concerning the competency of Spagnoulo to stand trial, the district court found Spagnoulo competent to stand trial and denied motions for a new trial. The district court then sentenced Spagnoulo as follows: fifty years imprisonment on each of Counts I and II to run concurrently; five years imprisonment on each of Counts III

and V to run concurrently with each other and with the sentences imposed on the first two counts; and five years imprisonment on Count IV to run consecutive to the sentences imposed on Counts I, II, III, and V. In addition, the court sentenced Spagnoulo to a four-year term of supervised release and ordered him to pay a $250 special assessment.

Spagnoulo filed a motion for new trial based upon the government's failure to comply with standing discovery orders requiring the production of results or reports of physical or mental examinations and of scientific tests or experiments. While Spagnoulo awaited trial, a psychiatrist and psychologist at the Metropolitan Correctional Center (MCC), a pretrial detention facility, performed a psychiatric evaluation of Spagnoulo. The psychology services at MCC performed this evaluation because of Spagnoulo's unprovoked attack on another inmate. On October 8, 1987, Dr. Ronald Neuhring, chief of psychology services at MCC, issued a report (the "Neuhring report") recommending that no disciplinary action be taken against Spagnoulo for the unprovoked assault because Spagnoulo's psychiatric evaluation indicated that a mental disorder, characterized as paranoid delusional thinking, motivated the assault.

As a result of Spagnoulo's diagnosis, the prison doctors ordered medication including Haldol, a major tranquilizer, Symetril, a drug used to offset the side effects of Haldol, and Xanax, an anti-anxiety medication. Based upon the Neuhring report, the government dismissed the assault charge. The defense lawyer in the assault case, which is a case separate from this case, obtained the Neuhring report after having filed a motion to compel discovery. The defense lawyer in the assault case then notified the defense lawyer in this case of the existence and contents of the report. When the defense lawyer in this case obtained the Neuhring report, the trial in this case was over.

## III. ISSUES

On appeal, Spagnoulo raises the following issues: (1) whether the district court erred in denying his motion for a new trial where the government failed to disclose results of the psychiatric evaluation before trial; (2) whether his conviction under 18 U.S.C. § 924(c) was improperly predicated upon his violation of the Travel Act, 18 U.S.C. § 1952(a)(2); (3) whether the district court's instruction on Title 18 U.S.C. § 924(c) constructively amended the indictment; and (4) whether the district court erred in denying Spagnoulo's motion for severance of counts.**

## IV. CONTENTIONS

Spagnoulo contends that the government's suppression of the psychiatric evaluation report, regardless of the good faith or bad faith of the prosecution, violated due process because the evidence was material to either guilt or punishment. In addition, Spagnoulo contends that despite the strength of the government's case, this evidence was material because it would have fundamentally altered the defense's strategy and made an insanity defense a viable option. Spagnoulo also contends that with regard to his punishment, this information would have materially altered his approach to plea negotiations.

The government contends that Spagnoulo could not establish a due process violation because he could not show that a "reasonable probability" existed that the outcome of the proceedings would have been different had the Neuhring report been disclosed. Specifically, the government contends that the mere fact that counsel might have utilized a different strategy does not approach a "reasonable probability" of a different outcome.

## V. DISCUSSION

Spagnoulo contends that the government's failure to provide the defense with the Neuhring report concerning his mental state violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and mandates a new trial. The Supreme Court

** Because we reverse the convictions on the first    issue, we do not address the other issues.

held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court defined the concept of "evidence favorable to an accused" as consisting of both impeachment evidence and exculpatory evidence. *See Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. Additionally, the Supreme Court noted in *Bagley* that "a constitutional error occurs and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. The Supreme Court in *Bagley* more clearly explained the concept of material evidence when it stated that "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

■ This court has announced a four-prong test to determine if a *Brady* violation has occurred mandating a new trial. In *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir.), *cert. denied*, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989), this court held that

> to establish a *Brady* violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Meros*, 866 F.2d at 1308 (citations omitted). In this case, Spagnoulo satisfies all four prongs of the test for a *Brady* violation.

■ First, the Neuhring report constituted evidence favorable to Spagnoulo in the possession of the government. The government concedes that the fact that the report was in the possession of an FBI agent is of no consequence. The former Fifth Circuit noted in *United States v. Antone*, 603 F.2d 566 (5th Cir.1979) that "this court has declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." *Antone*, 603 F.2d at 569. As this court recognized in *Meros*, the requirement that the government possess the evidence can be satisfied if the evidence was in the possession of the prosecutor or anyone over whom the prosecutor had authority. *Meros*, 866 F.2d at 1309. Therefore, the fact that the prosecutor in this case was different from the prosecutor in the assault case is immaterial.

The second prong is also satisfied because Spagnoulo did not possess the evidence nor could he obtain it with any reasonable diligence because we will not presume that Spagnoulo had the mental ability to know that the report existed at the relevant time. Additionally, Spagnoulo's lawyer did not learn of the assault leading to the psychiatric evaluation or Spagnoulo's regiment of medication until after the trial in this case. Thus, Spagnoulo satisfies the second prong because neither he nor his lawyer knew before trial about the favorable information in order to make an effort to obtain its production. *See United States v. Valera*, 845 F.2d 923, 927–28 (11th Cir.1988), *cert. denied*, 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989).

■ The third prong of the test is also satisfied. The government conceded, at oral argument, that for purposes of *Brady* analysis it suppressed favorable evidence. The Supreme Court has recognized that "suppression" for purposes of a *Brady* analysis is not "measured by the moral culpability, or the willfulness of the prose-

cutor." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). In *Agurs*, the Supreme Court reaffirmed its holding in *Brady* that the good faith or bad faith of the prosecutor was not a controlling consideration. *See Agurs*, 427 U.S. at 110 n. 17, 96 S.Ct. at 2400 n. 17. Additionally, the Court in *Agurs* went on to note that:

If evidence highly probative of innocence is in [the prosecutor's] file he should be presumed to recognize its significance even if he has actually overlooked it. Conversely, if evidence actually has no probative significance at all, no purpose would be served by requiring a new trial simply because an inept prosecutor incorrectly believed he was suppressing a fact that would be vital to the defense. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.

*Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400 (citations omitted). The Supreme Court's elimination of "moral culpability or willfulness" from the concept of "suppression" is based upon the following rationale:

The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.... A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile,".....

*Brady*, 373 U.S. at 87–88, 83 S.Ct. at 1197. Thus, in this case, the government's failure to disclose favorable evidence in its possession to the defense constituted the "suppression of favorable evidence" despite the absence of guile, willfulness, bad faith or moral culpability.

Finally, the fourth prong of the test for a *Brady* violation is also satisfied because had the evidence been disclosed to Spag-

noulo's lawyer, a reasonable probability exists that the outcome of the proceedings would have been different. *See Ashley v. State of Texas*, 319 F.2d 80 (5th Cir.), *cert. denied*, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263 (1963). In the words of *Brady*, "the evidence [was] material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. The Supreme Court has held that in determining whether the outcome of the proceeding would have been different had the prosecution disclosed evidence,

[the] reviewing court may consider directly any adverse effect that the prosecutor's failure to respond [to a *Brady* request] might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. The Neuhring report was "material" because it could have fundamentally altered the defense's strategy and made an insanity defense a viable option. Additionally, the report raised serious questions concerning Spagnoulo's competence to stand trial and could have materially altered the defense's approach to plea negotiations. The former Fifth Circuit held in a factually analogous case that psychological evidence favorable to the defense is of such

"vital significance to the accused persons in planning and conducting their defense, the failure of the District Attorney to inform [defense] counsel of [the] fact amounts to such fundamental unfairness in the trial of a criminal case as to amount to a denial of due process."

*Ashley*, 319 F.2d at 85.

Spagnoulo has established a *Brady* violation mandating the reversal of his conviction. *See Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. Thus, the district court abused its discretion in failing to grant Spagnoulo's

motion for a new trial. *See United States v. Jones*, 913 F.2d 1552, 1567 (11th Cir. 1990); *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir.1987).

## VI. CONCLUSION

Accordingly, we reverse the convictions and remand the case for a new trial.

REVERSED AND REMANDED.