ON WRIT OF CERTIORARI

WALLER, Chief Justice,
for the Court:
¶ 1. A jury in the Stone County Circuit Court found Anthony Mercie Expose guilty of having forcible sexual intercourse with Shannon M. Bessee. The Court of Appeals reversed and remanded his conviction because it found that the trial court had erred in refusing an instruction that would have informed the jury that consent is a defense to forcible sexual intercourse and that the State had the burden of proving that Bessee had not consented. We find that the trial court did not err in refusing this instruction. Additionally, we find that the post-trial discovery of a domestic-violence conviction involving Bes-see’s husband does not warrant a new trial. Therefore, we reverse the judgment of the Court of Appeals and affirm the verdict and sentence of the Stone County Circuit Court.
FACTS AND PROCEDURAL HISTORY
¶ 2. On March 24, 2009, Shannon M. Bessee moved to Wiggins, Mississippi, to live with her then-fiancé, Jason Bond. The couple was expecting their first child.
¶ 3. Three days later, Bessee; Bond; Bond’s friend, Quantis Husband; and Quantis’s girlfriend traveled to a Biloxi casino for an evening of entertainment. Around midnight, the party returned to the home shared by Bessee and Bond. What then happened in the early morning hours of March 28, 2009, is disputed. Bes-see claimed that Anthony Mercie Expose, an old friend of Bond’s, raped her. Expose acknowledged that he and Bessee had sex, but he asserted that it was consensual. Both Bessee and Expose testified at trial.

Bessee’s Testimony

¶ 4. During their drive home from the casino, Bessee and Bond got into an argument. As a result, the two of them slept in separate rooms that night. Bessee fell asleep before Quantis and his girlfriend left.
¶ 5. Around 2:30 a.m., Bessee awoke to a man standing over her. It was Expose, whom she knew as a friend of Bond’s. Three days earlier, Bond had introduced Bessee to Expose’s family at the local Wal-mart. Additionally, Bond and Bessee had given Expose a ride home on one occasion.
¶ 6. Bessee asked Expose how he had gotten into the house. Expose said that *1143 the door had been unlocked and that he had come to visit. She told him that it was not a good time and that he needed to leave. Expose tried to engage in conversation and eventually asked Bessee if she would drive him to a friend’s house. After trying unsuccessfully to wake Bond, Bes-see agreed to give Expose a ride.
¶ 7. Bessee was unfamiliar with the area, so Expose directed her where to go. After driving for some time, Expose asked her to stop the vehicle and wait a few minutes; he said that he had to talk to someone or do something. Bessee complied, and minutes later, Expose returned. They repeated stops like this one or two more times. Bessee said that she did not know what Expose did during those stops.
¶ 8. They drove around for approximately twenty or thirty minutes, with Expose directing Bessee to turn this way and that. Bessee became confused as to where they were. She began to be concerned. “I could feel that something wasn’t right,” Bessee said.
¶ 9. Finally, they turned onto a “gravel, red-dirt road” that had a house at the end of the road. The house was completely dark and there were no streetlights around.
¶ 10. Expose asked Bessee to turn off the vehicle’s headlights; he then got out. Bessee locked the doors, but the driver’s side window remained slightly open. Expose walked to the driver’s side, reached through the window, unlocked the door, and pulled Bessee out of the vehicle. He then dragged her down an embankment, pushed her face down into an ant bed, and began trying to remove her clothes. Bes-see pleaded for Expose to stop. But the more she resisted, the more aggressive he became. He put his elbow on her throat, removed her pants, and forced her to have sex.
¶ 11. Afterward, Bessee had bugs and ants crawling all over her body and biting her. She and Expose returned to the vehicle. Before doing so, however, Bessee decided to leave a piece of evidence at the scene. “I had flip-flops on and I threw them off, because I didn’t know where I was at. All I could think about was if they get [Expose], they will find my shoes,” Bessee said. Exhibit S-2 is a picture of the alleged crime scene showing a pair of black, Nike sandals lying on the ground.
¶ 12. Expose demanded that Bessee take him to a friend’s place. As they pulled onto the main road, Expose began smoking a pipe. Expose told Bessee to stop in front of what appeared to be an apartment complex. As Expose exited the vehicle, Bessee kicked him out the door. She then sped off and eventually found her way home.
¶ 13. At home, Bessee woke Bond and told him what had happened. They drove immediately to the Wiggins Police Department. An ambulance took Bessee to the Stone County Hospital where she underwent a rape-kit examination. The nurse who examined Bessee described her as teary and disheveled, and said that she had a lot of dirt on her. Bessee complained of cramping in her vaginal area and pain in her face and throat. She had bruises on her hands, wrists, and knees. And she had ant bites everywhere — “hundreds and hundreds of them,” Bessee said. Eddie Rogers, an investigator with the Stone County Sheriffs Department, saw Bessee at the hospital and noticed the ant bites. “[T]he ant bites ... had really festered, I guess would be the word, and they were showing up really well.... They were on her legs and her thighs and her hands,” Rogers said. Four days later, “pussy, boil-looking sores” broke out all over Bessee’s body. Exhibits S-5, S-6, *1144 and S-7 show pictures of ant bites on Bessee’s hand and legs.
¶ 14. In addition to receiving medical care at the hospital, Bessee spoke to police. She identified Expose as her assailant from a photo lineup.

Expose's Testimony

¶ 15. Expose maintained that he and Bessee had consensual sex on the night in question. He stipulated to DNA testing, which showed that the semen taken from Bessee belonged to him.
¶ 16. Expose testified that Bond had introduced Expose to Bessee before she had moved to Wiggins. He and Bessee “hit it off,” he said.
¶ 17. According to Expose, he and Bes-see had had consensual sex four or five times during the week before the March 28 incident. On those prior occasions, she would pick him up at his house, and they would drive to a particular bridge and have sex under the bridge.
¶ 18. After spending the evening of March 27 at a club, Expose visited Bond’s and Bessee’s home at approximately 1:00 a.m. the next day. Bond, Bessee, Quantis, Quantis’s girlfriend, and another man were there. Bond was asleep.
¶ 19. After awhile, Quantis, his girlfriend, and the other man left, leaving Expose and Bessee alone.[1] They chatted awhile before they decided to go for a ride.
¶ 20. Expose said that Bessee offered to give him ten dollars and that he took the money. They then stopped by a friend’s house, and he used the money to purchase crack cocaine. Bessee, who was questioned about this ten dollars during her testimony, did not recall giving Expose the money. “I know that there was $10 missing out of my car,” she said. In her written statement to the police, Bessee stated that she drove Expose to a friend’s house, as he had requested, and that, “[Expose] asked me to wait and give him $10.00, it was all I had. I asked what for, and then realized it was probably for drugs.”
¶ 21. After Expose purchased the drugs, Bessee drove him around while he smoked the drugs. As they rode around, Bessee confided in Expose about all the arguments she had been having with Bond.
¶ 22. Eventually, they stopped somewhere and had consensual sex in the vehicle. Expose, at first, testified that they had had sex in the back of the vehicle. On cross-examination, Expose was asked how that was possible considering that Bessee drove a canvas-topped Jeep and that Expose was six feet, seven inches tall. Expose clarified that they had let the seat down.
¶ 23. After they had engaged in consensual sex, Bessee exited the vehicle in order to use the bathroom. Expose said that Bessee hurried back into the vehicle moments later. “[S]he jumped back in the vehicle, said [she] may have heard something, a dog [ ] barking or something like that,” he said. But, according to Expose, Bessee never complained of any ant bites. She did, however, express some anxiety. “She looked a little nervous about being out this time of night with me and what she may have to face when she go[t] home,” Expose said.
¶ 24. Bessee drove Expose to a neighborhood where a friend of his lived and let Expose out of the vehicle.
*1145 ¶ 25. On cross-examination, the State confronted Expose with exhibits that showed pictures of Bessee’s bruised shoulder and scratched-up knees. Expose said he had no idea how those injuries had happened. Also, he said that Bessee had never complained about any ant bites.
¶ 26. On redirect, Expose was asked what he knew of Bond’s and Bessee’s relationship. He said that Bessee would talk to him about the problems that she and Bond were having. And he said that he had witnessed physical confrontations between Bessee and Bond. “I’ve seen [Bond] a few times hit [Bessee] upside the head, push her down, threaten to kill her,” Expose said.
¶ 27. At the conclusion of trial, the jury found Expose guilty of forcible sexual intercourse, and the trial court sentenced him to thirty-five years in the custody of the Mississippi Department of Corrections.
¶ 28. The following day, Expose filed a motion for new trial, or in the alternative, for a judgment notwithstanding the verdict. Expose argued, in part, that the State had failed to produce exculpatory evidence. The evidence consisted of police records which showed that on January 9, 2010 — approximately six months before trial — Bond had been arrested and charged with domestic violence-simple assault and that he had pleaded guilty weeks later, on January 25, 2010. Expose argued that he could have used this evidence to cross-examine Bessee. Further, he asserted that the evidence supported his trial testimony that he had witnessed Bond physically abuse Bessee, an assertion that the State’s attorney had laughingly dismissed at trial, according to Expose.
¶ 29. At a hearing on Expose’s post-trial motion, his defense counsel said that, “... I was told during the course of the trial something about [Bond’s domestic-violence conviction] might exist; and then, unfortunately, I couldn’t obtain it during the course of the trial.” Expose’s defense counsel explained that he had obtained the police records through a subpoena duces tecum filed a day after Expose’s trial.
¶ 30. Following the hearing, the trial court denied Expose’s Motion for New Trial, or in the Alternative, to Find a Judgment Notwithstanding the Verdict.
¶ 31. Expose appealed to this Court, and we assigned his case to the Court of Appeals. The Court of Appeals reversed the judgment and remanded the case. Expose v. State, 99 So.3d 1160 (Miss.Ct.App. 2011). It held that the trial court erroneously had denied Expose’s request for a jury instruction on consent. Id. at 1163. The court found that Expose had been entitled to a jury instruction that embodied his defense theory. Id. Because it reversed and remanded on the jury-instruction issue, the Court of Appeals did not address Expose’s second assignment of error: that the trial court had erred in failing to grant new trial based on the State’s failure to disclose exculpatory evidence. Id.
¶ 32. The State now files this petition for writ of certiorari. It argues that the jury was properly instructed and that the trial court did not err in refusing Expose’s consent instruction. We granted certiorari and now address the jury-instruction and exculpatory-evidence issues.
DISCUSSION
I. The trial court did not err in refusing a lesser-included offense instruction on simple assault or a consent instruction.
¶ 33. Expose proffered several instructions that the trial court refused; two of those, Instruction D-3 and Instruction D-6, are at issue here. Instruction D-3 *1146 would have informed the jury of three possible verdicts: It could find Expose (1) guilty of forcible sexual intercourse, (2) guilty of simple assault, or (3) not guilty. Instruction D-6 addressed consent. We must consider whether the trial court erred in refusing these two instructions.
¶ 34. “A defendant is entitled to have jury instructions given which present his theory of the case.” Heidel v. State, 587 So.2d 835, 842 (Miss.1991) (citing Murphy v. State, 566 So.2d 1201, 1206 (Miss.1990)). But this entitlement is limited: “[T]he court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Heidel, 587 So.2d at 842 (citing Murphy, 566 So.2d at 1206); see also Chinn v. State, 958 So.2d 1223, 1225 (Miss.2007) (stating that “ ‘where the defendant’s proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error’ ”) (quoting Phillipson v. State, 943 So.2d 670, 671-72 (Miss.2006)). A defendant has a fundamental right to have his or her lawful defense—even if the evidence is minimal or highly unlikely—presented as a factual issue before the jury under proper instruction. Chinn, 958 So.2d at 1225 (quoting O’Bryant v. State, 530 So.2d 129, 133 (Miss.1988)).
¶ 35. Jury instructions must be “ ‘read together and taken as a whole with no one instruction taken out of context,’ ” Chinn, 958 So.2d at 1225 (quoting Austin v. State, 784 So.2d 186, 192 (Miss.2001)), and there is no reversible error if “ ‘the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice.’ ” Chinn, 958 So.2d at 1225 (quoting Adkins v. Sanders, 871 So.2d 732, 736 (Miss.2004)).

A. Instruction D-3

¶ 36. As stated above, Instruction D-3 presented the jury with three possible verdicts, one of which was that it could find Expose guilty of the lesser crime of simple assault. The instruction stated, in pertinent part, that:
... If the State has failed to prove one or more of the essential elements of forcible sexual intercourse beyond a reasonable doubt, then you shall find the Defendant, ANTHONY MERCIE EXPOSE, Not Guilty of forcible sexual intercourse, and you will continue with your deliberations to decide if the Defendant is Guilty of the crime of simple assault.
If you find from the evidence in the case, beyond a reasonable doubt, that
1. the Defendant, ANTHONY MER-CIE EXPOSE, on March 28, 2009, in Stone County, Mississippi,
2. attempted to cause or purposefully, knowingly, or recklessly caused bodily injury to Shannon M. Bessee, or
3. attempted by physical menace to put Shannon M. Bessee in fear of imminent serious bodily injury,
then you shall find the Defendant, ANTHONY MERCIE EXPOSE, Guilty of simple assault....
The trial court acknowledged that simple assault might be considered as a lesser-included offense in a forcible-sexual-intercourse case but found that the evidence in this case simply did not support simple assault.
¶ 37. We find that the trial court properly refused Instruction D-3 because simple assault had no foundation in the evidence. Simple assault occurs when a person: “(i) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or (ii) negligently causes bodily injury to another with a *1147 deadly weapon or other means likely to produce death or serious bodily harm; or (iii) attempts by physical menace to put another in fear of imminent serious bodily harm-” Miss.Code Ann. § 97-3-7(l)(a) (Supp.2012). Simple assault can be a lesser-included offense to rape in some circumstances. Griffin v. State, 533 So.2d 444, 447-48 (Miss.1988). In Griffin, for example, a simple-assault instruction was proper because the evidence showed that the defendant could have been guilty of two separate crimes. Id. at 448. There, the defendant argued that he and the victim had engaged in consensual sex and that, later that same evening, he angrily had struck her several times. Id. at 447. Thus, the defendant asserted that there had been two distinct incidences, separated in time. Id. Accordingly, the jury reasonably could have found the defendant guilty of simple assault but not rape, without any inconsistency in the evidence. Id. at 448. That is not the case here. Expose never asserted that he had physically injured Bessee in a separate incident, before or after the two of them had had consensual sex. His testimony, rather, was that he and Bessee had had consensual sex and that he had never harmed her. He maintained that he did not know how she had received her injuries (though he implied that Bond could have caused them). So, even if the jury had believed Expose’s testimony, it could not have acquitted him of forcible sexual intercourse but found him guilty of simple assault. Therefore, we find that the trial court did not err in refusing Instruction D-3.

B. Instruction D-6

¶ 38. Instruction D-6 stated that: The Court instructs the Jury that consent is a defense to a Forcible Sexual Intercourse charge. Consent may be manifested by signs, actions, or facts, or by inaction or silence, from which arises an inference that the consent has been given. It exists where a person by his line of conduct has shown a disposition to permit another person to do a certain thing without raising objection thereto. The State has the burden to prove that Shannon M. Bessee did not consent to the Defendant’s acts on March 28, 2009. If the State has failed to prove beyond a reasonable doubt that Shannon M. Bes-see did not consent to the Defendant’s acts of March 28, 2009, then you must return a verdict of Not Guilty.
The State objected to the instruction on grounds that force, not consent, was the determining issue and that defining consent might confuse the jury. Expose, on the other hand, insisted that he was entitled to the instruction because consent was his only defense.
¶ 39. Expose appears to have lifted the language of Instruction D-6 from Seigfiied v. State, 869 So.2d 1040 (Miss.Ct.App. 2004). The defendant in Seigfiied was tried and convicted under Section 97-3-95(l)(a) of the Mississippi Code, which stated that “a person is guilty of sexual battery if he engages in sexual penetration with another person without his or her consent.” Id. at 1043 (citing Miss.Code Ann. 97-3-95(l)(a) (Rev.2000)). The defendant’s primary defense theory was that the young victim had consented; consequently, he proffered a consent instruction nearly identical to the one here. Id. at 1044. The trial court refused the instruction, and on appeal, the defendant argued that the refusal of the instruction had deprived him of his ability to defend himself. Id. The Court of Appeals found that the consent instruction had not been warranted because another instruction had required the jury to find that the defendant had committed the act without the victim’s consent. Id. at 1045.
*1148 ¶ 40. Unlike the sexual-battery statute in Seigfried, consent is not mentioned with regard to forcible sexual intercourse under Section 97-3-65(4)(a). Miss.Code Ann. § 97 — 3—65(4)(a) (Rev.2006). Section 97-3-65(4)(a) states, in pertinent part, that “[e]very person who shall have forcible sexual intercourse with any person ... upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes....” Miss.Code Ann. § 97 — 8—65(4)(a) (Supp.2012). Though consent was once considered to be an element of forcible sexual intercourse under prior versions of this statute, Hull v. State, 687 So.2d 708, 728 (Miss.1996) (citing Hai-ley v. State, 537 So.2d 411, 414 (Miss.1988); Miss.Code Ann. § 97-3-65(2) (1972)), “[t]he requirement that there must be both force and lack of consent is no longer required” under the current language. Modere v. State, 794 So.2d 200, 212 (Miss. 2001) (citing Miss.Code Ann. § 97-3-65(3) (Rev.2000)). Lack of consent has been subsumed by proof of use of force. Compare State v. Mackor, 11 Conn.App. 316, 527 A.2d 710, 713-15 (1987) (finding that lack of consent had been subsumed by proof of use of force as a result of statutory changes that eliminated nonconsent as an element of first-degree sexual assault).
¶41. Forcible sexual intercourse is all that is required under Section 97-3-65(4)(a). Instruction S-l conveyed this. It stated:
The Court instructs the jury that the Defendant, ANTHONY MERCIE EXPOSE, has been charged in the Indictment with the crime of Forcible Sexual Intercourse. If you find from the evidence in this case beyond a reasonable doubt that:
(1)on or about March 28, 2009, in the [sic] Stone County, Mississippi,
(2) the Defendant, ANTHONY MER-CIE EXPOSE, did feloniously, unlawfully, willfully and forcibly,
(3) have sexual intercourse with Shannon M. Bessee, then you shall find the Defendant, ANTHONY MERCIE EXPOSE, guilty of Forcible Sexual Intercourse.
If the State has failed to prove any one or more of the above elements, beyond a reasonable doubt, then you shall find the Defendant not guilty of Forcible Sexual Intercourse.
Thus, the jury was instructed, in accordance with the law, that it had to find beyond a reasonable doubt that Expose “feloniously, unlawfully, willfully and forcibly ... [had] sexual intercourse” with Bes-see. Since force negates consent, the jury necessarily must have considered consent in deciding whether force was used. Several courts, in similar contexts, have reasoned that a separate consent instruction was not required. State v. Adefusika, 989 A.2d 467, 476-77 (R.I.2010) (finding that the trial court did not err in refusing to instruct the jury that the victim must have demonstrated lack of consent where the statute defined first-degree sexual assault as sexual penetration with the use of “force or coercion,” and the jury instruction had used the verb “overcomes,” which meant that the jury had to have found lack of consent) (citations omitted); United States v. Martin, 528 F.3d 746, 751-53 (10th Cir.2008) (finding that the district court did not err in refusing defendant’s proposed consent instruction because the only proof of nonconsent demanded by the statute was that force or serious threat had caused the sexual act, and the elements instruction had tracked the statute’s language) (citations omitted); Day v. Com., 174 S.W.3d 496, 499 (Ky.Ct.App. 2005) (reasoning that since “ ‘lack of consent’ is an inescapable result of ‘forcible *1149 compulsion,’ ” the trial court did not err in refusing to give a consent instruction where the statute defined first-degree rape as “sexual intercourse with another person by forcible compulsion,” and the jury was instructed on forcible compulsion) (citations omitted); People v. Cruz, 923 P.2d 311, 312 (Colo.App.1996) (finding that the trial court did not err by refusing to instruct the jury on consent where the elements instruction followed the statute’s language by requiring the government to prove that the defendant “ ‘caused submission of [the victim] ... through the actual application of physical force or violence ...’”) (citations omitted); Mackor, 527 A.2d at 713-15 (finding that the trial court did not err in refusing to instruct the jury on consent because the statute defined first-degree sexual assault as “use of force or the threat of the use of force which serves to compel another person to engage in sexual intercourse,” which, in itself, was sufficient for the jury to consider whether the victim had consented to the act) (citations omitted); State v. Joem, 249 N.W.2d 921, 922-23 (N.D.1977) (finding that the trial court did not err in refusing to give a consent instruction because the instructions that were given required the jury “to find the use of force sufficient to overcome resistance,” and the requirement that “force” be found negated consent) (citations omitted). Not all courts agree, however. State v. Koperski, 254 Neb. 624, 578 N.W.2d 837, 839-47 (1998) (finding that an instruction on the substantive elements alone was insufficient); Mery v. Com., 12 Va.App. 821, 407 S.E.2d 18, 21 (1991) (“inferential treatment of the principle of consent did not adequately instruct the jury on a subject that was both vital to [defendant’s] defense and sufficiently supported by the evidence to make it a jury issue[ ]”); State v. Suka, 70 Haw. 472, 777 P.2d 240, 243^4 (1989) (rejecting the argument that a consent instruction was unnecessary since the jury had been instructed on forcible consent: “[o]nly the giving of a consent instruction will ensure that the defense of consent is not compromised[ ]”).
¶ 42. We hold that a consent instruction is not required where the statute demands only that force be proven, and the jury is instructed accordingly. Forcible sexual intercourse, by its very nature, negates the victim’s consent. Compare Cruz, 923 P.2d at 312 (stating that Colorado’s first-degree sexual-assault statute prohibits conduct that, by its very nature, negates the victim’s consent) (citation omitted). Instruction S-l required the State to prove that Expose feloniously, unlawfully, willfully, and forcibly had sex with Bessee. The State, therefore, had to prove that force— not Bessee’s consent — had caused the sex act. Compare Martin, 528 F.3d at 752 (using this same reasoning as support for why a consent instruction was not required in a federal sexual-assault case). Use of force is all the proof of nonconsent demanded by Section 97-3-65(4)(a). Id.
¶ 43. The instructions that were given in this case fairly announced the law and allowed the jury to weigh the issue of consent. Consent had been Expose’s theory of the case; it was squarely before the jury throughout trial; and the jury could not have failed to consider it. Compare Cruz, 923 P.2d at 312 (setting forth the same considerations as support for why a trial court had not erred in refusing a consent instruction tendered by the defendant in a first-degree sexual-assault case).
¶ 44. For all of the reasons stated above, we find that the trial court did not err in refusing Expose’s proffered consent instruction.
II. The post-trial discovery of Bond’s January 2010 domestic-violence conviction does not warrant a new trial.
¶ 45. Having found no error in trial court’s refusal to give a consent instruc *1150 tion, we must consider Expose’s second assignment of error: Whether the trial court erred in denying his motion for new trial based on his post-trial discovery of potentially exculpatory evidence, i.e. Bond’s January 2010 domestic-violence conviction. Expose does not question the district attorney’s office’s assertion that it did not know about Bond’s conviction; nonetheless, he maintains that nondisclosure of this information violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
¶ 46. In Brady, the Supreme Court held that “ ‘the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.’ ” King v. State, 656 So.2d 1168, 1174 (Miss. 1995) (quoting Brady, 373 U.S. at 87, 83 S.Ct. 1194). Years later, the Court more clearly explained that “evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
¶47. The United States Court of Appeals for the Eleventh Circuit developed a four-pronged test that this Court has used to determine whether a Brady violation has occurred. King, 656 So.2d at 1174 (citing United States v. Spagnoulo, 960 F.2d 990, 994 (11th Cir.1992)). Under that test, a defendant must prove: “(1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.” King, 656 So.2d at 1174 (citing Spagnoulo, 960 F.2d at 994).
¶ 48. First, it is not entirely clear if Bond’s January 2010 domestic-violence conviction would have been admissible at trial. Bond’s conviction falls within a subset of evidence sometimes referred to as “reverse 404(b)” evidence, in which evidence of another’s act is offered as exculpatory evidence by the defendant, rather than being used by a prosecutor against a defendant. United States v. Lucas, 357 F.3d 599, 605 (6th Cir.2004) (citing, e.g., United States v. Hill, 322 F.3d 301, 308 (4th Cir.2003)). Some courts use a standard Rule 404(b) analysis to consider the admissibility of such evidence {Lucas, 357 F.3d at 606); others use “a straightforward balancing of the evidence’s probative value under Rule 401 against Rule 403’s countervailing considerations of ‘prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.’ ” Id. at 605 (citing United States v. Stevens, 935 F.2d 1380, 1404 (3d Cir.1991)).
¶ 49. We need not consider whether Bond’s conviction would have been admissible; even if it was, we are unconvinced that there is a reasonable probability that its disclosure would have changed the outcome. First, the domestic violence committed by Bond occurred on January 9, 2010 — approximately nine
months after the incident in question here. The evidence, therefore, did not show that Bond had been physically abusing Bessee prior to March 28, 2009, as Expose alleged. But more significantly, evidence *1151 that Bond had abused Bessee still would not explain Bessee’s numerous ant bites.
¶ 50. Expose never offered a credible explanation for the ant bites. In its closing argument, the State told the jury that “[Expose] would have you believe that ... the victim went out to use the restroom and came right back in, and that’s why she has 4- or 500 ant bites on her.” That indeed might have been what Expose had intended the jury to believe, but he never asserted that directly. Bessee, according to him, never complained or said anything about an ant bite that night. Given the severity of the ant bites, it is inconceivable that she would not have said something or acted as though something was wrong.
¶ 51. In sum, Bond’s January 2010 domestic-violence conviction, if admitted, would not have changed the outcome of the trial, because (1) it related to an incident that occurred well after March 28, 2009, and (2) even if the jury had believed that Bond had caused all or some of the bruises or scratches, neither it nor any other evidence aside from Bessee’s testimony explained the ant bites. Therefore, we find that the post-trial discovery of Bond’s January 2010 domestic-violence conviction does not warrant a new trial.
CONCLUSION
¶ 52. We hold that the trial court did not err in refusing to give a consent instruction because the instructions that were given adequately conveyed the law and required the jury to find that Expose had used force. We further hold that the post-trial discovery of Bond’s January 2010 domestic-violence conviction does not warrant a new trial. Therefore, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Stone County Circuit Court.
¶ 53. THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE STONE
COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED. CONVICTION OF FORCIBLE SEXUAL INTERCOURSE AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AFFIRMED.
CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ.

. Quantis, a defense witness, testified that Expose simply had opened the door and walked right in the home as Quantis, Quantis’s girlfriend, Bessee, and a person named Josh were all sitting around. Quantis said that he, his girlfriend, and Josh left about thirty minutes after Expose arrived. Yet, Quantis also acknowledged that he was not sure about what date these events had occurred.