# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-00882-SCT

### CONSOLIDATED WITH

## NO. 1999-DP-01185-SCT

### and

## NO. 1996-DP-00943-SCT

*WILLIE JEROME MANNING a/k/a FLY*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT:            05/21/2013
TRIAL JUDGE:                 HON. LEE J. HOWARD
TRIAL COURT ATTORNEYS:       DAVID VOISON
                             MARVIN WHITE
COURT FROM WHICH APPEALED:   OKTIBBEHA COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:     DAVID PAUL VOISIN
                             ROBERT S. MINK
ATTORNEYS FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                             BY: MELANIE DOTSON THOMAS
                                  MARVIN L. WHITE, JR.
NATURE OF THE CASE:          CIVIL - POST-CONVICTION RELIEF
DISPOSITION:                 REVERSED AND REMANDED - 02/12/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC:**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Willie Manning is appealing the trial court's order denying him post-conviction relief. This appeal stems from Manning's conviction of brutally murdering two elderly women in Starkville, Mississippi. The only witness to testify that he saw Manning entering the

women's apartment shortly before their bodies were discovered was Kevin Lucious, a convict serving two life sentences without parole in Missouri. No witness testified to seeing Manning leave the apartment. A more complete statement of the underlying facts can be found in Manning's failed direct appeal, *Manning v. State*, 735 So. 2d 323 (Miss. 1999). Considerable evidence was presented to the jury, which found Manning guilty, and Manning was sentenced to death. This Court affirmed Manning's convictions and sentences.

¶2.    Manning filed a petition for post-conviction relief (PCR). This Court granted Manning leave to proceed with post-conviction proceedings on three grounds: withheld evidence, Kevin Lucious's testimony, and ineffective assistance of counsel related to those two claims. *Manning v. State*, 884 So. 2d 717 (Miss. 2004). The trial court denied Manning relief, and Manning appeals from that order.

## ISSUES

¶3.    On appeal from the trial court's denial of post-conviction relief, Manning raises the following issues:

I.      The State violated Manning's due process rights by failing to provide favorable, material evidence, the cumulative effect of which puts the case in a different light and undermines confidence in the verdict.

II.     The State violated Manning's due process rights through its knowing use of false testimony.

III.    Manning was denied his right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments and the Mississippi Constitution.

IV.    Manning is entitled to post-conviction relief due to the cumulative effect of these errors.

2

V.     Manning was denied his right to due process of law guaranteed by the Federal and State Constitutions due to the failure to allow him to inspect law enforcement files or admit portions of the files into evidence.

## STANDARD OF REVIEW

¶4.     "When reviewing a lower court's decision to deny a petition for post conviction relief, this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." ***Doss v. State***, 19 So. 3d 690, 694 (Miss. 2009) (citing ***Brown v. State***, 731 So. 2d 595, 598 (Miss. 1999)). This Court "must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact. . . .'" ***Doss***, 19 So. 3d at 694 (quoting ***Mullins v. Ratcliff***, 515 So. 2d 1183, 1189 (Miss. 1987)). However, "'where questions of law are raised the applicable standard of review is de novo.'" ***Doss***, 19 So. 3d at 694 (quoting ***Brown***, 731 So. 2d at 598). "The burden of proof at an evidentiary hearing on a PCR case is on the petitioner to show 'by a preponderance of the evidence' that he is entitled to relief." ***Doss***, 19 So. 3d at 694 (quoting Miss. Code Ann. § 99-39-23(7) (Rev. 2007)).

## ANALYSIS

¶5.     We agree with the trial court's decision to reject Lucious's recanted testimony and Likeesha Jones's testimony, finding no abuse of discretion. A trial judge is responsible for reviewing and evaluating the testimony of the witnesses, and this Court "will not overturn a decision to grant or deny a motion for new trial based on recanted testimony unless the circuit judge abused his discretion." ***Russell v. State***, 849 So. 2d 95, 107 (Miss. 2003). We

3

also agree with the trial court on the ineffective-assistance-of-counsel claim, but for a different reason. Manning's counsel should not be deemed ineffective, as their preparation and presentation was hamstrung from the beginning due to undisclosed favorable, material evidence.

¶6.     This leads us to Manning's claim that the State violated his due-process rights when it failed to provide favorable, material evidence, upon request. A canvass of all residents of Brooksville Gardens Apartments was initiated and conducted by the Starkville Police Department during its investigation. Index cards recording the results of the canvass were completed and maintained by the Starkville Police Department. An entry on the cards reveals that the apartment from which Lucious testified he observed Manning enter the victims' apartment was vacant at the time of the crime, and neither Lucious nor his girlfriend Jones was listed as a resident of any of the apartments canvassed.[1]

¶7.     "[J]ustice is more nearly achieved when . . . each side has reasonable access to the evidence of the other." *Box v. State*, 437 So. 2d 19, 21 (1983). *Brady v. Maryland* instructs "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963). "The principle [] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.

---

[1]Other records, including a lease and affidavit testimony, were admitted into evidence at the post-conviction-relief hearing supporting that the apartment was vacant the day of the crime, January 18, 1993. The apartment was leased by Jones February 1, 1993.

Society wins not only when the guilty are convicted but when criminal trials are fair[.]"

***Brady***, 373 U.S. at 87, 83 S. Ct. at 1197 (citing ***Mooney v. Holohan***, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935)).

¶8. Our Court and numerous other courts have adopted the following four-prong test:

> To establish a ***Brady*** violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

***King v. State***, 656 So. 2d 1168, 1174 (Miss. 1995) (citing ***U.S. v. Spagnoulo***, 960 F. 2d 990, 994 (11th Cir. 1992)).

¶9. As to prong one, the State acknowledges that the Starkville Police Department had the canvass cards in its possession. Uncontroverted testimony was adduced at the hearing that (1) the cards were not provided to the district attorney's office and (2) the cards were not otherwise provided to defense counsel. We conclude the evidence was favorable to Manning for impeachment of Lucious's testimony. Prong one is satisfied.

¶10. As to prong two, Manning's primary attorney testified that the canvass cards were not in the file provided prior to trial. The investigation of the January 18, 1993, crime commenced that day, with a complete canvass of the apartment complex ordered within days. Initially, Manning was not implicated as a suspect and was not indicted until more than a year later. Manning's attorneys were not appointed until May and August 1994. The trial took place in 1996, three-and-a-half years after the crime. The likelihood that Manning's court-appointed attorneys could have diligently secured the same information by conducting

a canvass of the apartment complex in the years after the crime defies computation of even a minimal degree of success. Thus, prong two is satisfied. ***King v. State***, 656 So. 2d at 1174.

¶11.   As to prong three, the United States Supreme Court has stated that, under a ***Brady*** analysis, "suppression" does not encompass a determination of "moral culpability" or "willfulness." ***Spagnoulo***, 960 F. 2d at 994-995 (quoting ***U.S. v. Agurs***, 427 U.S. 97, 110, 96 S. Ct. 2392, 2400, 49 L. Ed. 2d 342 (1976)). The focus is on the "character of the evidence," not on the "character of the prosecutor." ***Spagnoulo***, 960 F. 2d at 995 (quoting ***Agurs***, 427 U.S. at 110, 96 S. Ct. at 2400). Suppression can be attributable to a state actor who withholds material evidence. ***Spagnoulo***, 960 F. 2d at 994-99 (quoting ***U.S. v. Antone***, 603 F. 2d 566, 569 (5th Cir. 1979)) ("[T]his court has declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both *investigative* and prosecutorial personnel.") (emphasis added) (*also quoted by* ***King v. State***, 656 So. 2d at 1176).[2]

¶12.   The Police Chief of Starkville, who at the time of the crime was the captain in charge of investigations and a lead officer in this case, testified at the PCR hearing that he ordered the canvass of the apartment complex. The canvass cards were all present in the Starkville Police Department file. The district attorney testified that he never saw the canvass cards and that he would have investigated the discrepancy had he possessed the information. The

---

[2] ***King*** may overstate who may be state actors, for the quoted language used is derived from a footnote in the special concurrence of ***Box***, joined by only two justices. ***King***, 656 So. 2d at 1174-75 (quoting ***Box***, 437 So. 2d at 25 n.4). For the purposes of ***Brady***, the "prosecution" depends on the particular facts of a case. Unquestionably, it encompasses the primary investigative agency, the Starkville Police Department, the factual scenario found in today's case.

record supports that neither the district attorney's office nor the defense attorneys were aware of the evidence. The reasons why the information was not disclosed is immaterial. However, because there was suppression of material evidence by a state actor, prong three is satisfied. *Spagnoulo*, 960 F. 2d at 995 (quoting *Agurs*, 427 U.S. at 110, 96 S. Ct. at 2400).

¶13. "[T]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Spagnoulo*, 960 F. 2d at 994 (quoting *United States v. Bagley*, 473 U.S. 667, 682. 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985)). Evidence "favorable to an accused" includes both impeachment evidence and exculpatory evidence. *Spagnoulo*, 960 F. 2d at 994 (citing *Bagley*, 473 U.S. at 676, 105 S. Ct. at 3380). Both the defense attorneys and the district attorney testified that their actions in preparing for the case and presenting the case would have been different had they possessed the evidence. The defense attorneys testified that the receipt of this favorable, material evidence would have altered their defense. There is no question that defense counsel would have had the opportunity to meaningfully impeach Lucious's testimony that he lived in the apartment at the time of the crime and saw Manning enter the victims' apartment. Any attorney worth his salt would salivate at impeaching the State's key witness using evidence obtained by the Starkville Police Department. As stated *supra*, the district attorney's testimony that he would have investigated the discrepancy between Lucious's testimony and the cards is also crucial to prong four, bolstering that a reasonable probability exists that the outcome of the proceedings would have been different. Manning satisfies prong four. *Spagnoulo*, 960 F. 2d at 994; 656 So. 2d at 1174.

7

## CONCLUSION

¶14.    Accordingly, the State violated Manning's due-process rights by failing to provide favorable, material evidence. We reverse the judgment of the Oktibbeha County Circuit Court denying Manning post-conviction relief, and we reverse Manning's conviction and sentence and remand the case to the trial court for a new trial.

¶15.    **REVERSED AND REMANDED**.

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS AND COLEMAN, JJ., CONCUR. KING, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.**

**CHANDLER, JUSTICE, DISSENTING:**

¶16.    I respectfully dissent. On our highly deferential standard of review, I would affirm the trial court's denial of post-conviction relief. I note the unlikelihood that justice for the victims will be served, given the difficulties of retrying a case two decades after the date of the crime.

¶17.    We will not disturb the factual findings of a trial court in denying a petition for post-conviction relief unless such findings are clearly erroneous. *Rowland v. State*, 42 So. 3d 503, 506 (Miss. 2010). I would defer to the well-reasoned logic of the seasoned trial judge as stated in his order denying post-conviction relief:

> [T]hese [canvass cards] are insufficient to undermine confidence in the verdict reached at Petitioner's trial. Neither Lucious' trial testimony, nor any statement given by Lucious prior to 2010, mentioned Apartment 11-E, or indicated that there was an issue regarding where he lived at the time of the murders. Therefore, even if these canvass cards had been disclosed, there would have been no reason to introduce them for impeachment purposes, leading this Court to the conclusion that the canvass notes are insufficient to create a reasonable probability that, had they been disclosed, the proceedings would have been different.

8

¶18.    The majority would find a **Brady**[3] violation based on the purported impeachment value of the canvass cards. But the canvass cards did not facially contradict Lucious's testimony at trial. Manning's own trial attorney, Mark Williamson, acknowledged that having had access to the canvass cards would not likely have triggered a red flag to investigate Lucious's residence, given that, like the State, Manning's attorney had no knowledge of the specific apartment number from which Lucious viewed Manning enter the victim's apartment.

¶19.    Lucious was known to frequent Brooksville Gardens at the time of the murders, and no one disputes his frequent presence there prior to the official start of his girlfriend's lease: hanging out with the Mannings, buying beer from Dera Mae, and, I submit, likely squatting or at least spending time in the vacant apartment on which his girlfriend was about to sign a lease. Dolph Bryan had also personally observed Lucious at Brooksville Gardens during the time of the investigation, further supporting that, to the State's knowledge, Lucious's testimony that he was present at Brooksville Gardens at the time of the murders was true. Forrest Allgood testified that:

> All I recall is him testifying that he looked out a window and this is what he saw. Quite frankly, that's all I was interested in. I didn't delve into which apartment he said he was in or anything of that nature . . . . The only thing that was important to me was did the man see what he saw.

The supposed impeachment value of the cards therefore is not as significant as the majority would represent. Manning also has presented no evidence showing that defense counsel was precluded from reviewing the original police file containing the canvass cards, and

[3] **Brady v. Maryland**, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

9

Manning's post-conviction counsel easily obtained the file from the police department. I therefore agree with the trial court that Manning has failed to establish the requisite prejudice for the finding of a ***Brady*** violation.

¶20.    Moreover, Lucious's recantation came in stages and in an inconsistent manner that supports that his recantation is not credible.[4] We first have his statements to the police from 1994 and his 1996 trial testimony, in which he testified to witnessing Manning enter the victim's apartment on the day of the murder. He also testified to participating in or overhearing conversations during the weeks after the murders in which Manning bragged about how "it doesn't take nothing to kill somebody" said that "if I had known that they didn't have any more than they had I wouldn't have killed them mother*******." Between 1994 and 2001, Lucious gave at least five statements implicating Manning in the murders. His girlfriend, Likeesha Jones, also gave at least three statements during that time, also implicating Manning.

¶21.    Then, in a 2002 affidavit, Lucious partially recanted his trial testimony and the version of events he gave at trial. While still maintaining that he lived in the apartment across the way from the murders, and that he saw a man enter the apartment the day of the murders, he claimed that he could not positively identify the man as Manning due to poor eyesight.

¶22.    It was not until 2010 that Lucious claimed, for the first time, that he did not live at the apartments the day of the murder, that he did not observe anyone enter the victims' apartment, that he was not present at Brooksville Gardens at all that day, and that he did not

---

[4] Lucious was only one of many trial witnesses who placed Manning at Brooksville Gardens on the day of the murder, including Nancy Elliott, Barbara Duck, and Larry Harris.

overhear any conversations whatsoever, at any time, regarding Manning's involvement in the murders.[5]

¶23.   Despite the official start date of the lease being a few weeks after the murders, the circumstances support Lucious's original testimony that he and Likeesha Jones were physically present in apartment 11E by the time of the murders. The apartment records show that the previous tenant had moved out several months prior to the January murders. This left the apartment physically unoccupied for several months prior to the start of Jones's official lease. Testimony was presented at the PCR hearing that squatting was very common at Brooksville Gardens.

¶24.   While Jones claimed at the PCR hearing that they were not living in 11E at the time of the murders, she also testified that she had met with the apartment manager, Harold Williams, some time prior to moving in, at the start of the application process, and that he had informed her that the apartment had been empty, and therefore there would be no problem with her moving in. This conversation further supports the opportunity and likelihood that Jones and Lucious were physically in the apartment during the lease-application process, which included a wait period for Jones's income verification from the welfare department. The record reflects that her lease application was in progress around the time of the January 18 murders, including a January 20 stamped application for her income verification.

---

[5] At the time of this version of the story, Lucious was in Missouri serving life without parole and three concurrent life sentences for first-degree murder, first-degree assault and two counts of armed criminal action.

¶25. Jones's credibility at the hearing was further discounted by the testimony of Mark Williamson, one of Manning's trial attorneys. Jones had testified that, around the time of trial, she identified Williamson as Manning's lawyer from either the newspaper or television, and that she looked up his number in the phone book and called him twice to tell him that Lucious's eyewitness testimony would not be reliable because they did not live at the apartments at the time of the murder. But Williamson testified at the PCR hearing that if he had received such calls, he certainly would have followed up on them. Lucious was, without question, an extremely important witness. But until his unreliable recantation, whether he was living at Brooksville Gardens on the day of the murder was never a contested issue. And, regardless of the technical start date of the lease, the testimony and evidence established that Lucious frequented Brooksville Gardens before the lease start date.

¶26. On post-conviction review, we owe high deference to the trial court's determination of the credibility of the witnesses. The record reflects that the trial judge took this task very seriously, insisting, for example, that Lucious be transported to testify in person rather than submit a video affidavit. Lucious's gradual and inconsistent recantation of his trial testimony is not credible, and Jones's testimony was refuted by the testimony of Manning's trial attorney. Because I would affirm the trial court's denial of post-conviction relief, I respectfully dissent.

**PIERCE, J., JOINS THIS OPINION.**