# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-01226-COA

**AMY DENISE TOWLES A/K/A AMY DENISE THOMAS TOWLES A/K/A AMY TOWLES**                               APPELLANT

**v.**

**STATE OF MISSISSIPPI**                               APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/24/2014 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | ALCORN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JULIE ANN EPPS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | J. TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF AGGRAVATED ASSAULT AND SENTENCED TO TWENTY YEARS, WITH FIVE YEARS TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, FIFTEEN YEARS SUSPENDED, AND FIVE YEARS OF POST-RELEASE SUPERVISION |
| DISPOSITION: | REVERSED AND REMANDED - 06/14/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND WILSON, JJ.**

**BARNES, J., FOR THE COURT:**

¶1.     On September 20, 2012, Amy Towles was indicted for aggravated assault on William Clay Wells.  After a jury trial in Alcorn County Circuit Court, she was convicted and sentenced to twenty years, with five years to be served in the custody of the Mississippi Department of Corrections (MDOC), fifteen years suspended, and five years of post-release

supervision. After the circuit court denied her posttrial motions, Towles appealed. Finding the circuit court erred in refusing to give the defendant's proposed self-defense instruction, we reverse and remand for a new trial. The State's acknowledgment of improper "send-a-message" arguments to the jury further supports reversible error.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

¶2.     Towles and Wells had a tumultuous, off-and-on dating relationship for four years, until Towles shot and seriously injured Wells with a .22-caliber rifle in the early morning hours of June17, 2012. Wells had spent the night at Towles's residence the previous evening (June 15). Towles lived alone in an upstairs apartment at her mother's home/farm. Wells drove Towles's van to his job the following morning, June 16, but he brought it back to her midday and went back to work.[1] He was later dropped off at Towles's apartment by a coworker sometime between 7:00 and 8:30 p.m. that evening.

¶3.     There is some discrepancy regarding the events that transpired after Wells arrived at Towles's apartment that evening. According to Wells, Towles "wanted to go out dancing" when he got home, but he was tired from work; so he just drank a couple of beers, planning to retire early.[2] He said Towles kept trying to convince him to go out, and they began arguing over "petty" things. He claimed Towles struck him "several times" and hit him with a full beer bottle. He eventually went to bed sometime between 10:30 p.m. and midnight. Wells said that he awoke around 3:00 a.m. and found Towles sitting on the couch, drinking

---

[1] Towles claimed Wells took the van without her permission.

[2] Although Wells claimed he was not a "big drinker," medical records indicate a history of substance abuse.

2

alcohol and watching television, which prompted another fight.

¶4.     Towles, however, asserts she had planned to stay home that evening and was not aware Wells was coming over.  She claims she was preparing Father's Day gift baskets, and a client stopped by at 9:00 p.m. to pick one up.[3]  She said Wells was "agitated" and wanted to discuss moving in with her, and he was "angry" because she did not want him to accompany her to Memphis to visit her family the next day for Father's Day.  Towles did not want Wells to move in due to his past issues with drug abuse.  She admitted "he did push [her] button one time that night, and [she] threw a lamp in his direction," but denied hitting him.  Towles stated that after she threw the lamp, she "caught [herself]," not wanting to fight with him anymore.  She wanted to take him home, and Wells went downstairs, presumably to get his laundry.  However, when Wells came back upstairs to the apartment, he "passed out on the couch"; so Towles went to bed, not wanting to "arouse him from sleep to fight some more."  Towles awoke in the middle of the night to find Wells angry and awake; he began throwing and breaking her dishes.  She testified that, "in all of [their] fights, [she] had never seen anything like it, like a tornado. . . . [H]e was just tearing up everything."  She picked up her son's .22-caliber rifle that was by the door, "trying to get him to focus on right then and where [they] were and [trying to get] him to calm down."   But she claimed it had the "opposite effect"; he broke the windows of the french doors to the apartment.

---

[3] Towles previously worked as a linguist (Persian/Farsi) for the Air Force for several years, and then worked as a paralegal.  Although Towles was characterized as unemployed at the time of the shooting, and considered disabled due to a medical condition (Crohn's disease), she states that she was self-employed, helping to manage and maintain her family's farm and selling natural, homemade products from the farm.

3

¶5. Wells admitted that he broke a dish "to release some anger and busted out the wall, but . . . [he stated he] never laid a hand on [Towles]." He also acknowledges that he walked outside to the porch area and broke the glass of the apartment's french doors. But Wells claims he decided to leave the apartment at that point and walk to the nearby truck stop to call a friend to pick him up; so he proceeded down the outside stairs to the driveway. He heard Towles run up behind him, and when he turned, he saw her with the rifle. Wells stated that Towles shot him in the driveway, and he had to drag himself up the stairs to where she was sitting and watching television. He contends she refused to help him at first, but eventually relented and called 911.

¶6. Towles's version of events leading to the shooting is substantially different. She maintains that after Wells broke the glass in the french doors, he remained on the deck outside the doors, angrily pacing and shouting "ugly things" at her. It was at this point Wells "came straight at [her]," and when she reflexively backed up, the gun went off accidentally. Initially, she was not certain he was hit. When she realized he was injured, Towles said she went to get dressed to drive him to the hospital. She said she came back into the room, and Wells was drinking a soda from the refrigerator. He collapsed, and she could not lift him; so she called 911.

¶7. The record shows that Towles called 911 at 3:58 a.m., requesting an ambulance; the 911 operator testified that Towles told her there had been "an accidental shooting." Alcorn County Sheriff's Deputy Shane Crowe soon arrived on the scene, noting the broken glass in the french doors and "several broken dishes in the floor." He asked Towles where the gun

4

was; she initially replied that she was not sure. However, she quickly produced the rifle and handed it to the deputy.

¶8. At this point, Wells was awake, but unresponsive. EMS took him to the local hospital for medical treatment. Although Wells's injuries were, according to his surgeon, "almost uniformly fatal," he survived. Wells, who has an admitted history of substance abuse, had Lortab, cocaine, and Adderall in his system at the time of the shooting.[4] He claimed that the drugs were taken "a day or two prior" to the incident.

¶9. In the meantime, Investigator Tommy Hopkins arrived and talked to Towles, who stated that the gun accidentally discharged. The investigator said Towles did not appear to be intoxicated, and she freely gave her version of the events. She told law enforcement that she had firearm experience, and she later testified: "I had been shooting guns most of my life [(hunting)], and I was just a few points short of expert marksmanship." Deputy Crowe noted that "her story changed." Towles initially stated that the gun fell and went off. However, she later told the deputy that she pointed it at Wells, admitting she had pulled a gun on Wells "several times in the past" to calm him down when they would fight.

¶10. After a jury trial, Towles was convicted of aggravated assault on July 24, 2014. The circuit court sentenced her to twenty years, with five years to be served in the custody of the MDOC, fifteen years suspended, and five years of post-release supervision. She filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial, arguing that the sufficiency and weight of the evidence did not support the verdict and

---

[4] Towles testified that she had a prescription for Adderall; she had been "on it for about [fifteen] years." She said that she "had to start hiding [her] medication from [Wells]."

that the inclusion of the term "recklessly" in Jury Instruction S-1, as an element of the offense, constituted reversible error. She also filed a motion to reconsider her sentence, claiming it was excessive and noting hardship due to her Crohn's disease. The circuit court denied her motions on August 26, 2014, and she now appeals.[5]

## DISCUSSION

I.   **Whether the circuit court erred in giving Jury Instruction 2 (State's Jury Instruction S-1), which Towles claims constructively amended the indictment.**

¶11. Towles claims that the State constructively amended the indictment when it submitted Jury Instruction S-1 at trial, which added the term "recklessly" to the elements of the offense. The original indictment stated, in part, that Towles

> did willfully, unlawfully and feloniously commit an aggravated assault upon . . . Wells by attempting to cause and by causing, knowingly and purposely, serious bodily injury to . . . Wells, a human being, in that [s]he did shoot the said . . . Wells with a .22[-]caliber rifle, striking his abdomen, thereby manifesting extreme indifference to the value of human life; in violation of Mississippi Code Annotated section 97-3-7 [(Supp. 2011).]

However, Jury Instruction S-1 provided:

> Towles is charged with aggravated assault. If you find beyond a reasonable doubt from the evidence in this case that on or about July 17, 2012[,] in Alcorn County, Mississippi, . . . Towles knowingly, purposely, or recklessly, under circumstances manifesting extreme indifference to the value of human life and not as a result of accident or misfortune, caused serious bodily injury to . . . Wells by shooting the said . . . Wells with a .22[-]caliber rifle striking him in the abdomen, then you shall find . . . Towles guilty as charged.

The circuit court gave the instruction as Jury Instruction 2.

---

[5] On November 7, 2014, Towles was granted bail in the sum of $50,000 pending her appeal.

¶12.   At the time Towles was charged, Mississippi Code Annotated section 97-3-7(2) (Supp. 2011) provided in pertinent part:[6]

> A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]

Prior to the verdict, defense counsel argued that the indictment "seemed to be kind of a hybrid indictment using parts of Section 97-3-7(2)(a) and (b), and . . . that it was both confusing and misleading . . . and . . . based on that, the reckless part shouldn't have been in the instruction." In her motion for a JNOV, Towles reasserted her claim that the indictment was erroneously amended, but the circuit court concluded that the "subsections of the aggravated[-]assault statute are similar and not mutually exclusive," and the indictment was sufficient to advise Towles of the charges against her.

¶13.   "A constructive amendment of the indictment occurs when the proof and instructions broaden the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted without proof of the elements alleged by the grand jury in its indictment." *Bell v. State*, 725 So. 2d 836, 855 (¶58) (Miss. 1998). An indictment's primary purpose "is to give a defendant fair notice of the crime charged." *Williams v. State*, 169 So. 3d 932, 935 (¶9) (Miss. Ct. App. 2014) (citing *Hines v. State,* 126 So. 3d 985, 987 (¶10) (Miss. Ct. App. 2013)). "Each and every material fact and essential

---

[6] The statute has been amended since 2011, but the text of the relevant language has not changed other than to change the subsection notations from (a) and (b) to (i) and (ii).

ingredient of the offense must be with precision and certainty set forth." *Id*. (quoting *Burchfield v. State,* 277 So. 2d 623, 625 (Miss. 1973)).

¶14. There is no dispute that the language in Towles's indictment is a "hybrid" or "blended" version of both subsections of the statute. In *McLarty v. State*, 842 So. 2d 590, 593-94 (¶13) (Miss. Ct. App. 2003), this Court concluded that amending an indictment to "collapse (a) and (b) [of section 97-3-7(2)]," five days prior to trial, "confuse[d] the two separate subsections" and rendered the indictment "defective and unclear." *Cf. Mason v. State*, 867 So. 2d 1058, 1059 (¶6) (Miss. Ct. App. 2004) ("Section 97-3-7(2) delineates two separate crimes of aggravated assault."). However, in *Johnson v. State*, 910 So. 2d 1174, 1179 (¶16) (Miss. Ct. App. 2005), we subsequently held that the blending of the two subsections of the aggravated-assault statute in an indictment "should [not] be classified necessarily as a 'defect[,]' [and] even if we were to accept that this blending of the subsections was a defect, such a defect in this case would be one of form only[.]" Whether an amendment to an indictment is one of substance rather than form involves a determination of whether the change "materially alter[s] facts which are the essence of the offense on the face of the original indictment or . . . . materially alter[s] a defense to the original indictment so as to prejudice the defendant's case." *McLarty*, 842 So. 2d at 593 (¶11) (quoting *Chandler v. State,* 789 So. 2d 109, 111 (¶4) (Miss. Ct. App. 2001)).

¶15. In *Stevens v. State*, 808 So. 2d 908, 919 (¶35) (Miss. 2002), the supreme court considered a defendant's claim that his indictment should have been dismissed "because it did not enumerate the elements of aggravated assault." The Court reasoned:

8

> Because [Glynn] Stevens was charged not under a specific single subsection of [section] 97-3-7(2), it necessarily follows that he was charged under both subsections comprising that section. Stevens was therefore *put on notice that he was being charged with aggravated assault under both subsections*, i.e., by causing injury under circumstances manifesting extreme indifference to the value of human life and by causing bodily injury with a deadly weapon or other means likely to produce death or serious bodily harm.

*Stevens*, 808 So. 2d at 920 (¶36) (emphasis added). More recently, the supreme court, discussing *Stevens* and *Johnson*, reaffirmed that the "subsections of aggravated assault are not mutually exclusive[.]" *State v. Hawkins*, 145 So. 3d 636, 644 (¶22) (Miss. 2014).

¶16. Towles contends, however, that the addition of the term "recklessly" constituted reversible error, citing *Quick v. State*, 569 So. 2d 1197 (Miss. 1990). Unlike Towles, the defendant in *Quick* was specifically indicted under section 97-3-7(2)(b). On the morning of trial, the State moved to amend the indictment to add the following phrase: "[I]ntentionally or recklessly under circumstances manifesting extreme indifference to the value of human life contrary to [section] 97-3-7(2)(a) and (b) of Mississippi Code of 1972, as amended." *Quick*, 569 So. 2d at 1198. The jury instructions were changed by interlineation to reflect the amended language. *Id*. at 1198-99. The *Quick* court determined there was "no doubt that the jury acted under the language contained in the proposed amendment because it inquired of the court, after it had retired, as to the meaning of that language." *Id*. at 1200. Thus, because the "new element" was not in the original indictment, and the jury clearly relied on the jury instruction's language in returning its verdict, the supreme court found it was reversible error. *Id*. As the State observes, *Quick* is factually distinguishable from the present case – the indictment here did not specify a subsection of the statute, and there is no

9

evidence that the jury convicted Towles based on the addition of the term "recklessly."

¶17.   Under these circumstances, we find Towles suffered no prejudice from the State's inclusion of the term "recklessly" in the jury instruction.  The original indictment clearly provided that she was being charged under section 97-3-7; thus, she had sufficient notice of the charges against her.  Accordingly, we find no error in the circuit court's giving of Jury Instruction 2 (S-1).

>   **II.    Whether the circuit court's failure to instruct the jury on self-defense was reversible error.**

¶18.   At trial, Towles submitted Jury Instruction D-4, which read:

> The Court instructs the jury that an individual shall be deemed justified in the use of deadly force when committed by any person in the defense of one's own person or any other person, where there shall be reasonable grounds to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.

The circuit court refused the instruction without explanation.  However, when questioned by defense counsel as to why the defendant's jury instruction on the castle doctrine was denied, the court responded:

> So, now, if I understand the defense asserted in this case, it is characterized in the law as accident and misfortune . . . . And I think that states clearly the position of the defendant in this case, what her claim is, that she had no intention to shoot him, but that because of mishandling or otherwise, the gun discharged.

Towles argues that although the gun accidentally fired and hit Wells, she was also entitled to a self-defense instruction, as she picked up the gun to defend herself.  Therefore, she claims the circuit court abused its discretion in refusing Jury Instruction D-4.

¶19.   Jury instructions "are to be read together as a whole[, and a] defendant is entitled to

10

have jury instructions given which present his theory of the case." *Booker v. State*, 64 So. 3d 988, 995 (¶15) (Miss. Ct. App. 2010) (citation omitted). "An instruction should not be given to a jury submitting a theory which is not supported by the evidence." *Wadford v. State*, 385 So. 2d 951, 954 (Miss. 1980).

¶20. The State claims that Towles's version of events does not support a self-defense instruction, citing her statements to law enforcement that it was an accident. Neither Investigator Hopkins nor Deputy Crowe indicated that Towles told them she shot Wells in self-defense. During the direct examination of Investigator Hopkins, he was asked:

> Q. Did she at any point in this conversation say or indicate [in] any way that Mr. Wells was trying to break into her house and that was the reason she shot him?
>
> A. No, sir.
>
> Q. Did she indicate at any point during that conversation that she had to shoot him, he was attacking her, or that she shot him in self-defense?
>
> A. No, sir.

The State also contends "[t]here is an inherent conflict between Towles'[s] claims that the shooting was both accidental and done in self-defense," and observes there was no evidence that Wells attempted to throw anything at Towles or hit her; Towles was merely upset he was destroying her property.

¶21. We disagree with the State's position. Towles distinctly testified during direct examination at trial that she was scared of Wells during the fight, saying, "I didn't know what I was dealing with."

> Q. And when he came and turned around at you that night and started

11

toward you, were you afraid of him?

A.   Well, yes, that's why – I mean, in an instant, I backed up. I took a step back, and that's when the gun went off.

 . . . .

A.   Okay. I was very scared. I did not know what I was dealing with. . . . All this mayhem and rampage and rage, *I picked up the gun because I couldn't predict what would happen.* He was, you know, being very violent and I was scared.

 . . . .

A.   *For me to have picked up that gun at all, it was because I was scared of him.* . . . But I know I had never seen this level of rage, and yes, I was scared.

(Emphasis added). During cross-examination, Towles reiterated: "The man was scaring me. The man was threatening me. He was tearing up my house, and one of us was going to the hospital that night."

¶22.   Admittedly, "[a] defendant simply saying that he or she shot someone in self-defense or that the shooting was an accident in and of itself does not provide a defendant with a right to a jury instruction on self-defense, nor does it obligate a jury to accept such defense." *Johnson v. State*, 52 So. 3d 384, 397-98 (¶41) (Miss. Ct. App. 2009). As the supreme court has held, "[a] defendant is not entitled to use deadly force in self-defense based upon a subjective fear of great bodily injury unless it is determined by a jury that this fear is reasonable under the circumstances." *Ellis v. State,* 708 So. 2d 884, 887 (¶8) (Miss. 1998).

¶23.   But the photographic exhibits show broken dishes scattered on the floor of the apartment and busted windows in the french doors. Wells admitted he caused this damage

12

and was angry with Towles that night. Wells's medical records reveal that he had several drugs in his system that evening – Lortab, cocaine, and Adderall. He also acknowledged he drank beer that night. Therefore, there is more than just Towles's testimony to support her version of events and to support a finding that her fear of Wells was "reasonable under the circumstances."

¶24. Regarding whether the self-defense instruction contradicted Towles's claim that the shooting was accidental, we find that no conflict exists in these circumstances. Towles stated she picked up the gun in an attempt to calm Wells down and because he was "being very violent and [she] was scared." In *McTiller v. State*, 113 So. 3d 1284, 1292 (¶26) (Miss. Ct. App. 2013), we recognized that "a criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." (Quoting *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999)). The circuit court in that case had denied Mike McTiller's self-defense instruction "on the basis that it was contradictory to his accident defense." *Id*. at (¶25). This Court concluded that the refusal of the self-defense instruction was reversible error, as there was evidence that the defendant thought the victim was pulling a gun and that the victim rushed the defendant first. *Id*. at 1293 (¶28).

¶25. Here, the jury was given Jury Instruction 3, which stated in pertinent part: "If you find from the evidence that . . . Towles shot . . . Wells by accident and misfortune *while performing a lawful act by lawful means*, with usual and ordinary caution and without any unlawful intent, then [you] are to return a verdict in favor of the defendant." (Emphasis

13

added).[7]  A self-defense instruction would have allowed the jury to consider whether Towles

possessed the gun in a lawful manner and through lawful means to defend herself.  Thus, the

fact the gun may have discharged accidentally, under these circumstances, is not in conflict

with Towles's claim that she picked up the gun in self-defense.

¶26.    Accordingly, we find the circuit court's refusal of the proposed self-defense jury

instruction was reversible error and remand for a new trial consistent with this opinion.

> **III.    Whether Jury Instruction 3 improperly instructed the jury on accident and mistake, or alternatively, whether counsel was ineffective for not objecting to the giving of the instruction.**

¶27.    Towles argues that the circuit court erred in giving Jury Instruction 3 (State's Jury

Instruction S-5), which provided:

> Accident and misfortune is an affirmative defense to aggravated assault.
>
> The defendant has asserted the defense of accident by claiming the shooting of . . . Wells occurred as the result of the accidental discharge of a rifle she was holding and pointing at . . . Wells.
>
> If you find from the evidence that . . . Towles shot . . . Wells by accident and misfortune while performing a lawful act by lawful means, with usual and ordinary caution and without any unlawful intent, then [you] are to return a verdict in favor of the defendant.
>
> If, however, you find from the evidence in this case beyond a reasonable doubt that the State has proven the necessary elements of aggravated assault and that the shooting of . . . Wells by the defendant was not the result of accident and misfortune, you should find the defendant guilty as charged.

Towles argues that the instruction was "deficient because it improperly limited the defense

to only one subsection of the applicable statute[.]"  The defense of accident and misfortune

---

[7] We will address Jury Instruction 3 in greater detail in Issue III.

14

is defined in Mississippi Code Annotated section 97-3-17 (Rev. 2014):

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
>
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
>
> (c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.

Here, the jury instruction included language from subsection (a), but not (b) or (c). Towles's contention is that the instruction should have also included language from subsection (b), noting both parties' agitated states during the argument that preceded the shooting. To support her claim, Towles cites *McTiller*, a case in which this Court concluded that "the jury should have been privy to all three subsections of [section 97-3-17] to determine if any of the three subsections applied to [the defendant's] case." *McTiller*, 113 So. 3d at 1291 (¶19).[8]

¶28. As defense counsel did not object to the State's instruction, we must determine if the alleged deficiency in the jury instruction's language constitutes plain error. *See Williams v. State*, 134 So. 3d 732, 736 (¶15) (Miss. 2014) (finding that because counsel failed to "object to any of the jury instructions complained of on appeal[,]" the defendant's "points of contention are subject to plain-error review"). "Under our plain-error doctrine, there has to

---

[8] We noted in *McTiller* that while section 97-3-17 references homicide, "we have held it a natural extension that these principles 'should apply to make an assault that does not result in death excusable under the same circumstances.'" *McTiller*, 113 So. 3d at 1291 (¶19) (quoting *Rogers v. State,* 994 So. 2d 792, 802 (¶41) (Miss. Ct. App. 2008)).

be a finding of error, and that error must have resulted in a manifest miscarriage of justice for reversal to occur." *Id*. (citing *Gray v. State,* 549 So. 2d 1316, 1321 (Miss. 1989)). Plain error will be found "only where a fundamental right of the defendant has been violated." *Fitzpatrick v. State*, 175 So. 3d 515, 522 (¶31) (Miss. 2015). "A defendant has a fundamental right to have his or her lawful defense – even if the evidence is minimal or highly unlikely – presented as a factual issue before the jury under proper instruction." *Expose v. State*, 99 So. 3d 1141, 1146 (¶34) (Miss. 2012) (citing *Chinn v. State,* 958 So. 2d 1223, 1225 (¶13) (Miss. 2007)). However, in cases where there is no evidentiary basis for such an instruction, it is appropriate for the court to refuse such an instruction. *Smith v. State*, 171 So. 3d 542, 547 (¶13) (Miss. Ct. App. 2015).

¶29.     In *Thomas v. State*, 818 So. 2d 335, 350 (¶55) (Miss. 2002), the Mississippi Supreme Court, discussing whether a jury instruction on accident or misfortune under section 97-3-17 should have been given, held that a "necessary component of 'heat of passion' is 'a state of violent and uncontrollable rage.'" (Quoting *Mullins v. State,* 493 So. 2d 971, 974 (Miss. 1986)). There is undisputed evidence that Towles and Wells were engaged in a heated argument prior to the shooting. Wells testified that he broke Towles's dishes because "[a]nger would come over [him]," and "[he] don't hit women." However, the State argues there is no testimony to support there was "sudden and sufficient provocation," although it acknowledges Towles's testimony that he "came straight at [her]." It also contends that subsection (b) required Towles to pick up the gun in response to the provocation. Towles did testify, however, that she picked up the gun in response to Wells's "mayhem and rampage

16

and rage[.]" She said, "He was . . . being very violent and I was scared."

¶30.    In *Clayton v. State*, 106 So. 3d 802 (Miss. 2012), the supreme court considered a similar scenario that involved Quincy Clayton's shooting of his wife during a domestic argument. Coincidentally, the Claytons' argument also occurred on Father's Day, after Mrs. Clayton began swinging a steak knife at her husband during breakfast. *Id*. at 803 (¶2). After she cut him a couple of times and threatened him, Clayton grabbed a 12-gauge shotgun from the hall closet. He claimed he was "trying to bluff her so [he] could get [his] shoes [on] to go to church," when she came at him with the knife. The gun went off, killing her. *Id*. at 803-04 (¶2). Clayton argued the shooting was an accident. At trial, the circuit court gave the defendant's jury instruction on accident and misfortune that included only subsection (a), but refused the defendant's second proposed instruction that included language from subsection (b) regarding "heat of passion" and "sudden and sufficient provocation." *Id*. at 805 (¶7). Finding reversible error, the supreme court concluded that the refused instruction "correctly stated the law" and found that evidence of the couple's "escalating argument," and the victim's use of a knife "to threaten and cut" the defendant moments before the shooting, "provided a sufficient evidentiary foundation . . . to present a heat-of-passion theory to the jury." *Id*. at 806 (¶¶10-11).

¶31.    In *Clayton*, however, the jury instruction was submitted by counsel and denied by the circuit court. Here, as no instruction containing subsection (b) was submitted to the court, we must determine whether this omission rose to plain error. Our supreme court has held that a defendant has a fundamental right to the jury being instructed on her theory of defense,

17

if supported by the evidence. *Expose*, 99 So. 3d at 1146 (¶34). While there was evidence that the parties were angry and fighting prior to the shooting, a circuit court "has no affirmative duty to offer jury instructions sua sponte or to suggest instructions for the parties to consider." *McGregory v. State*, 979 So. 2d 12, 18 (¶12) (Miss. Ct. App. 2008) (citing *Giles v. State,* 650 So. 2d 846, 854 (Miss. 1995)). Therefore, we conclude that the circuit court's failure to modify Jury Instruction 3 to include the language regarding subsection (b) did not constitute plain error.

¶32. We further find that we need not address Towles's alternative claim "that defense counsel's failure to object to the defective instruction or to proffer a jury instruction containing all the subsections of the statute" constitutes ineffective assistance of counsel. A claim of ineffective assistance of counsel brought on direct appeal should not be addressed on the merits unless "the record affirmatively shows ineffectiveness of constitutional dimensions, or . . . the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc. are not needed." *Read v. State,* 430 So. 2d 832, 841 (Miss. 1983). If it cannot be determined from the record that counsel's performance was constitutionally ineffective, and the case is reversed on other grounds, "the ineffectiveness issue . . . become[s] moot." *Id*. As we are reversing on the issue of the court's refusal of the self-defense instruction, and we cannot determine on direct appeal why Towles's trial counsel did not object to Jury Instruction 3 or proffer an alternative jury instruction, we find this claim by Towles is rendered moot.

    **IV.**    **Whether the prosecution's cross-examination of Towles constituted plain error under *Doyle v. Ohio*, 426 U.S. 610 (1976), and whether**

18

**defense counsel was ineffective by not objecting to the questioning.**

¶33. Prior to her oral statement to Investigator Hopkins, Towles was given *Miranda*[9] warnings and signed a waiver of rights. However, when Investigator Hopkins called her two months later to sign the transcribed statement, Towles told him that she needed to speak with her attorney "before she signed anything[.]" Towles never signed the statement. During cross-examination, the State questioned Towles regarding her failure to sign the statement provided by Investigator Hopkins:[10]

> Q. And, Ms. Towles, you were given the opportunity to review that statement, to read it and see if it was correct, make any additions, corrections, subtractions that you wanted to, and you refused to do so, did you not?
>
> A. No, that's not how that happened.
>
> Q. Well, you heard the testimony of [Investigator] Hopkins, who said that he called you and asked you to do that, and you said on advice of an attorney that you weren't going to do that and weren't going to talk to him.
>
> A. My attorney has never said we weren't going to do it. [The attorney] was going to look over the statement and advise me whether or not I should validate it, ratify it, whichever word you choose . . . . The document was never submitted to my attorney for us to review it before it went to the grand jury. So it was not as if he said look at this and ratify it and I said no. I never laid eyes on that document until after I had been indicted[.]

---

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[10] On March 13, 2014, counsel for Towles filed a motion to suppress her statement to police, noting that Investigator Hopkins "did not reduce this statement to writing until August 20, 2012, nearly two (2) months after the oral statement was given to him" and that Towles "did not review th[e] statement, did not sign it, had no opportunity to make corrections to it, and did not ratify and accept this as an accurate reflection of her statement[.]" The circuit court denied the motion.

19

Towles argues that the prosecution's cross-examination regarding her failure to sign the statement constituted an improper inference that her testimony was false and was prohibited under *Doyle v. Ohio*, 426 U.S. 610 (1976). Defense counsel did not object to the questioning, but Towles claims that the comments should warrant reversal under plain error.

¶34. In *Doyle*, the United States Supreme Court held "it would be fundamentally unfair and a deprivation of due process to allow [an] arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id*. at 618. Thus, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id*. at 619.

¶35. The State contends that *Doyle* is not applicable, citing Towles's waiver of her *Miranda* rights and her voluntary oral statement given to Investigator Hopkins.

> [I]f the defendant does not take advantage of his right to remain silent, any statements he voluntarily makes can and will be used against him in a court of law. The United States Supreme Court's holding in *Doyle* simply reiterates that the defendant's silence cannot be used against him during cross-examination. However, because [the defendant] did not invoke his right to silence, and made voluntary statements, the *Miranda* and *Doyle* provisions do not apply. To hold otherwise would not only afford the defendant the right not to incriminate himself by remaining silent but would also afford him the right not to incriminate himself by making voluntary statements which are inconsistent with his testimony at trial.

*Puckett v. State*, 737 So. 2d 322, 350-51 (¶85) (Miss. 1999). In *Robinson v. State*, 40 So. 3d 570, 575 (¶17) (Miss. Ct. App. 2009), where the defendant was given his *Miranda* warnings and subsequently chose to provide "oral statements to law enforcement," this Court concluded that there was "no *Doyle* violation or violation of post-*Miranda* silence."

¶36. Towles's response is that the issue "is not that the prosecutor used [her] prior

20

statements to argue inconsistencies with her trial testimony," but that "he used her failure to sign her statement and her invocation of her right to counsel to argue that she was guilty." To support her claim, she cites *State v. Jones*, 575 A.2d 216, 220 (Conn. 1990), a case in which the prosecution made two references during closing argument to the defendant's refusal to sign a transcribed statement of his taped statement from the day of his arrest. The Connecticut Supreme Court found that the prosecution's statements constituted error under *Doyle*. *Id*. at 221. However, it concluded that the statements were harmless error, as the prosecutor did not "focus upon" the defendant's invocation of his right to remain silent, and "the jury would have returned a guilty verdict without the impermissible comments by the prosecutor[.]" *Id*. at 222.

¶37. We find no merit to Towles's claim. The questioning regarding Towles's statement arose from the preceding testimony about her version of the events of that evening:

> Q. Now, you said you told the investigators, including [Investigator] Hopkins, the same thing this morning after you shot . . . Wells as you're telling us in the courtroom today. Could you tell us when you told him about, first of all, a visitor that night and also about a planned trip with your father or with your family? When did you tell them that?
>
> A. I told him all of that.
>
> Q. And that would be in the statement that he took from you, then wouldn't it?
>
> A. Well, perhaps between the two months that passed from the time I gave him a statement and the time it was reduced to writing, he didn't see the need to put those facts in there. But, yes, I told him both of those things.

Therefore, the subsequent comments made by the prosecution about her failure to sign the

statement were an attempt to point out inconsistencies between her testimony and the statement given to law enforcement. "[W]here a prosecutor's questions and comments are aimed at eliciting an explanation for an arguably prior inconsistent statement, no *Doyle* violation occurs." *Robinson*, 40 So. 3d at 574 (¶14) (citing *Anderson v. Charles*, 447 U.S. 404, 409 (1980)).

¶38. Furthermore, unlike *Jones*, Towles was able to respond at trial to the prosecution's comments during cross-examination, asserting she was never afforded the opportunity to sign the statement. She also explained on redirect examination that when she contacted her attorney regarding signing the statement, he told her that he "would get in touch with Investigator Hopkins and get [the statement.] I know those two spoke, but for whatever reason that document never got to me."

¶39. Accordingly, we conclude that the prosecution's comments regarding Towles's failure to sign the statement did not violate *Doyle*. Alternatively, even if the State's comments were improper, they would constitute harmless error, as nothing indicates the jury relied on the prosecution's comments in arriving at its guilty verdict. Furthermore, because we find no merit in Towles's claim of error on this issue, she cannot demonstrate prejudice to establish her alternative claim of ineffective assistance of counsel.

    **V.**    **Whether the prosecution's "send a message" comments during closing arguments constituted plain error.**

¶40. Towles's last issue concerns statements made by the prosecution during closing arguments, which she claims were impermissible and warrant a finding of plain error. During closing arguments, the prosecuting attorney stated:

There is something that can be done about the shootings that we have that are far too prevalent and the killings that we have, and that something is for jurors like you, good people like you, a cross-section of this community, to say, "Wait a minute. We are the conscience of this community. We will not have this. We will do something about it in Alcorn County."

. . . .

In a few minutes this case will be yours. As I said earlier, you're the conscience of the community.

. . . .

As I said earlier, you'll decide what kind of community this is. You'll decide if we allow things like this to go on, if we allow people to get into arguments and then go get a gun and shoot them and say, "Oh, but it was an accident. You can't convict me because it was an accident." You will decide that.

Defense counsel made no objection to the comments. While "the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing argument, we will review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (¶26) (Miss. 2013) (citations omitted).

¶41.   Our supreme court has firmly stated: "We have repeatedly condemned the 'send a message' argument and warned prosecutors accordingly." *Payton v. State*, 785 So. 2d 267, 270 (¶11) (Miss. 1999) (citations omitted). The State concedes the prosecution's statements were improper; however, it argues that the comments do not constitute reversible error. In *Forbes v. State*, 771 So. 2d 942, 951 (¶27) (Miss. Ct. App. 2000), our Court distinctly held that "it is error to urge jurors to consider that the verdict [they] return is going to be reflective of the conscience of this community." (Quotations omitted). However, we found that the

23

comments in *Forbes* were not "so egregious as to prevent the jurors from reaching an appropriate verdict," acknowledging that there have been few cases in which this argument has constituted reversible error. *Id*. at (¶28).

¶42. Towles, however, contends that it is not apparent whether the jurors would have convicted her absent the offending comments. As we have already found reversible error in this case, we need not make that determination. "The cumulative error doctrine holds that while harmless error in and of itself is not reversible, where more than one harmless error occurs at the trial level, those errors may have the cumulative effect of depriving a defendant of a fair trial." *Wilson v. State*, 21 So. 3d 572, 591 (¶58) (Miss. 2009). Thus, even if the prosecution's statements were harmless error, the cumulative effect of this error, combined with the other error discussed in Issue II, further warrants a reversal of Towles's conviction and a remand for a new trial.

¶43. **THE JUDGMENT OF THE CIRCUIT COURT OF ALCORN COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ALCORN COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**

24